UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MATTI KIUPEL,<br><br>     *Plaintiff,*<br><br>  v.<br><br>**THE BOARD OF TRUSTEES OF MICHIGAN STATE UNIVERSITY, MICHIGAN STATE UNIVERSITY, TERESA K. WOODRUFF,** *in her individual and official capacity,* **BIRGIT PUSCHNER,** *in her individual and official capacity,* **DALEN W. AGNEW,** *in his individual and official capacity,* **KIMBERLY DODD,** *in her individual and official capacity,* **NICOLE SCHMIDTKE,** *in her individual capacity,* **DOUGLAS FREEMAN,** *in his individual and official capacity,* **and KATHYANN LEWLESS,** *in her individual capacity,* **and THOMAS D. JEITSCHKO,** *in his individual capacity and official capacity,*<br><br>     **Defendants.** | **Civil Action No.**_ _ _ _ _ _ _<br><br>**COMPLAINT AND**<br><br>**JURY DEMAND** |

Plaintiff Matti Kiupel, by and through his attorneys, Nesenoff & Miltenberg, LLP, whose offices are located at 363 Seventh Avenue, 5th Floor, New York, New York 10001, alleges upon knowledge with respect to himself, and upon knowledge, information, and belief as to all other matters, as follows:

## THE NATURE OF THIS ACTION

I.     Plaintiff Matti Kiupel ("Dr. Kiupel" or "Plaintiff") is an academic researcher and a tenured member of the faculty at Michigan State University ("MSU").

I.

2.    On or about December 30, 2021, with no notice to Plaintiff of the allegations, against him, Plaintiff's supervisors, Dr. Kimberly Dodd and Dr. Dalen Agnew, acting in concert with MSU's then Dean, Birgit Puschner and Human Resources executive, Kathyann Lewless, imposed significant sanctions against Plaintiff's employment.

3.    Defendants failed and refused to advise Plaintiff of the allegations for five months before the University's then Title IX Coordinator, Nicole Schmidtke, finally issued him a written complaint, on May 17, 2022, erroneously alleging violations of MSU's Title IX/sexual misconduct policies.

4.    Fourteen months later, on April 24, 2023, a hearing officer rendered a decision in which she found Plaintiff not responsible for sexual misconduct (the "Decision").

5.    In a comprehensive analysis, the hearing officer determined that none of the allegations, even if true, stated a violation of the University's sexual misconduct/Title IX policy because none of Plaintiff's alleged conduct was sexual in nature.

6.    As was made plain from the Decision, Plaintiff had engaged in no sexual misconduct and was wrongfully disciplined for behavior that was consistent with his disability, Autism Spectrum Disorder, a mental impairment that substantially limits Plaintiff's social communication and interaction.

7.    However, to this day, the University has not lifted the sanctions against Plaintiff. Plaintiff has been completely stripped of all of his former duties involving clinical teaching of veterinary students and residents, prohibited access to campus, unable to conduct research in his area of expertise, and effectively isolated from the scholarly community.

8.    And, on July 27, 2023, Plaintiff was informed by Douglas Freeman, Interim Dean, and Thomas Jeitschko, Interim Provost and Executive Vice President for Academic Affairs, that

MSU was keeping the sanctions in place and added additional sanctions while it conducted a purported "administrative review" to "assess" whether Plaintiff "engaged in other reported behaviors that violate University policies."

9.     The so-called "administrative review" is a sham, and an attempt to find some other basis to terminate Dr. Kiupel, since MSU's failed Title IX scheme, and the ongoing sanctions constitute discipline without notice and a hearing, in violation of MSU's written policies and practice.

I0.   As detailed below, at all times relevant to this Complaint, Defendants were under intense pressure to hold men responsible for accusations of sexual harassment brought by female complainants. The sources of this pressure included, *inter alia,* scandal, and ongoing liability, faced by MSU and its officials for sexual assaults committed by its former employee, physician Dr. Larry Nassar.

11.     In the midst of widespread public criticism and official condemnation for MSU's perceived failure to appropriately respond to complaints of sex abuse by Nassar's female victims of sexual assault, Defendants sought to aggressively demonstrate a blindwillingness to believe all women who claimed sexual harassment and to convict and punish the accused.

12.     Plaintiff, whose alleged *conduct-even if proved-would* not constitute a violation ofMSU's Title IX and sexual misconduct policies, was a casualty of this campaign.

13.     Defendants' actions are in violation of Plaintiff's rights under Title IX of the Education Amendments of 1972, 20 U.S.C. *§§* 1681, *et seq.,* the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § I983, Section 504 of the Rehabilitation Act, 29 U.S.C. 794 ("Section 504"), the Americans with

Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.,*

14.     Accordingly, through this civil action, Plaintiff seeks damages and injunctive relief.

## THE PARTIES

15.     Plaintiff Matti Kiupel ("Dr. Kiupel" or "Plaintiff") is a professor at Michigan State University and resides in Laingsburg, Michigan, and is a qualified person with a disability within the meaning of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

16.     At all relevant times, Petitioner was an "employee" of Defendants Michigan State University within the meaning of Section 504, Title VII, and the ADA.

17.     Defendant Michigan State University ("MSU" or the "University") is a public university under the laws of Michigan, with its principal place of business in East Lansing, Michigan.

18.     Defendant Michigan State University Board of Trustees ("Board") is an eight-member board responsible for making rules and regulations to govern Michigan State. The election of these Trustees is prescribed by Article XIII, Section 5 of the Michigan State Constitution and Michigan Election Law section 168.286.

19.     Defendant MSU is a recipient of federal funds and required to comply with Title IX and all implementing regulations and § 504 of the Rehabilitation Act.

20.     The Board and MSU are collectively referred to herein as the "MSU Defendants."

21.     Defendant Teresa K. Woodruff ("Woodruff") was the Interim President of MSU at all times relevant to this Complaint. Ms. Woodruff is sued in her individual capacity for all claims of relief made against her, except for the request of prospective injunctive and declaratory relief,

4.

in which case she is sued in in her official capacity. Upon information and belief, Ms. Woodruff resides in Michigan, within this judicial district.

22.     The Board, and Ms. Woodruff as the Board's administrative hand during the period in question, are responsible for ensuring that all MSU employees are properly trained and supervised to perform their jobs.

23.     Defendant Birgit Puschner ("Puschner" or "Dean Puschner") is sued in her individual capacity for all claims of relief made against her, except for the request of prospective injunctive and declaratory relief, in which case she is sued in in her official capacity. Puschner served as Dean of the College. ofVeterinary Medicine ("CVM") at MSU between 2018 and 2023 and currently holds an appointment as a professor in the Department of Pathobiology and Diagnostic Investigation (the "Department") and the Veterinary Diagnostic Laboratory ("VDL") at MSU. Upon information and belief, Defendant Puschner resides in Michigan, within this judicial district.

24.     Defendant Dalen W. Agnew ("Agnew") is sued in his individual capacity for all claims ofreliefmade against him, except for the request of prospective injunctive and declaratory relief, in which case he is sued in in his official capacity. Agnew is Professor and Chair of the Department at CVM at MSU. Upon information and belief, Agnew resides in Michigan, within this judicial district.

25.     Defendant Kimberly Dodd ("Dodd") is sued in her individual capacity for all claims of relief made against her, except for the request of prospective injunctive and declaratory relief, in which case she is sued in in her official capacity. Dodd is the Director of the VDL at CVM at MSU. Upon information and belief, Dodd resides in Michigan, within this judicial district.

5.

26.     Defendant Nicole J. Schmidtke ("Schmidtke") is sued in her individual capacity for all claims of relief made against her, except for the request of prospective injunctive and declaratory relief, in which case she is sued in in her official capacity. Schmidtke served as the Title IX Coordinator in the Office of Institutional Equity ("OIE") at MSU at all times relevant to this Complaint. Schmidtke was responsible for ensuring that the University complied with all applicable antidiscrimination laws. Upon information and belief, Schmidtke resides in Michigan, within this judicial district.

27.     Defendant Douglas Freeman ("Freeman") is sued in his individual capacity for all claims of relief made against him, except for the request of prospective injunctive and declaratory relief, in which case he is sued in his official capacity. Freeman holds an appointment as Interim Dean of CVM at MSU. Upon information and belief, Freeman resides in Michigan, within this judicial district.

28.     Defendant Kathyann Lewless ("Lewless") is sued in her individual capacity for all claims of relief made upon her, except for the request of prospective injunctive and declaratory relief, in which case she is sued in her official capacity. Upon information and belief, at all relevant times, Lewless held a position as the Director of MSU's Offices of Academic Human Resources ("HR"). Upon information and belief, Lewless resides in Michigan, within this judicial district.

29.     Defendant Thomas K. Jeitschko ("Jeitschko") is sued in his individual capacity for all claims of relief made upon him, except for the request of prospective injunctive and declaratory relief, in which case he is sued in his official capacity. Jeitschko is the Senior Associate Provost at MSU. Upon information and belief, Jeitschko resides in Michigan, within this judicial district.

30.     At all relevant times Defendants Puschner, Agnew, Dodd, Schmidtke, Freeman, Lewless, and Jeitschko acted within the scope of their employment or agency within MSU.

6.

31.     At all relevant times, Defendants were acting under color of law, statutes, ordinances, regulations, policies, customs, and/or usages of the State of Michigan and/or MSU.

## JURISDICTION AND VENUE

32.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367 because the federal law claim arises under the Constitution and statutes of the United States, and the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

33.     Subject matter jurisdiction is also founded upon 28 U.S.C. § 1343(a)(3)-(4), which gives district courts original jurisdiction of any civil action authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States, and any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

34.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

35.     This Court has personal jurisdiction over Defendant MSU because it is established under the laws of Michigan and operates in the State of Michigan.

36.     This Court has personal jurisdiction over the individual Defendants because they are all residents of Michigan.

7.

## EXHAUSTION  OF ADMINISTRATIVE REMEDIES

37.     On February 18, 2024, Dr. Kiupel filed an administrative charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on sex, in violation of Title VIL  On March 20, 2024, Plaintiff amended his Charge, EEOC, Case No. 471-2024-03382, adding a claim for discrimination under the ADA.

38.     On April 2, 2024, the EEOC issued Plaintiff an official notice of his right to sue on Charge No. 471-2024-03382.

39.     Accordingly, Plaintiff has timely and properly exhausted his administrative remedies and satisfied all pre-conditions to bring the within claim.

I.     **Dr. Kiupel's Professional Background**

40.     Plaintiff is a veterinary pathologist, specializing in comparative pathology and molecular diagnostic pathology.

41.     Since July I, 2001, Plaintiff has been employed by MSU as a professor of anatomic pathology in the Department of Pathobiology and Diagnostic Investigation (the "Department") at MSU in the College of Veterinary Medicine ("CVM").

42.     The Department's responsibilities include the provision of advanced training in veterinary pathology programs within the CVM and Graduate School, research activities related to veterinary science and the diagnosis of disease in animals, and diagnostic services in connection with CVM's Veterinary Diagnostic Laboratory ("VDL").

43.     Plaintiff began his career path as an academic more than 30 years ago with education and training in his native Germany.

44.     Plaintiff received his veterinary degree from the Freie University of Berlin, Germany in 1996, and was awarded his doctoral degree on canine malignant lymphomas in 1999.

45. Plaintiff completed a residency in anatomic pathology from 1996 until 1999, became a board-certified pathologist in 2000 and finished his PhD on the pathogenesis on porcine circovirus in 2001 at Purdue University, Indiana.

46. Plaintiff has published more than 370 peer-reviewed scientific manuscripts and numerous book chapters and books in the field of veterinary and comparative pathology.

47. Until recently, Plaintiff was the editor and a lead author on the series of "Surgical Pathology of Tumors of Domestic Animals," which represents the WHO International Histological Classification of Tumors of Domestic Animals.

48. Plaintiff served on the Scientific Advisory Council of the Animal Cancer Foundation and previously served on the board of directors of the Davis-Thompson Foundation for the Advancement of Veterinary and Comparative Pathology.

49. Plaintiff was the longest serving Associate Editor for Oncology in Veterinary Pathology.

50. For numerous years, Plaintiff served as chair of the American College of Veterinary Pathologists ("ACVP") oncology committee and the American Association of Veterinary Laboratory Diagnosticians ("AAVLD") pathology committee.

51. Numerous molecular diagnostic tests developed by the Plaintiff have become the gold standard in the prognosis of various tumor entities in dogs and cats and these tests are run in large numbers by the VDL generating significant annual income. A grading system for canine mast cell tumors, one of the most common canine neoplasms, is named after the Plaintiff.

52. Until recently, Plaintiff had an exemplary professional reputation, and was frequently an invited speaker in international and national conferences including more than one hundred invited talks overseas on topics of tumor pathology and diagnostic molecular pathology.

He was co-author and/or editor of some of the leading textbooks in veterinary pathology and tumor pathology

53. Plaintiff had been frequently recruited by other employers when leadership positions became available, including some of the leading institutions in his field.

A. **April 2001: Plaintiff's Faculty Appointment and Tenure at MSU**

54. Plaintiff has held a professorship in anatomic pathology at MSU since 2001. He was awarded tenure in 2006 and became a full professor in 2012.

55. Upon his hire by MSU in April 2001, Plaintiff received an appointment letter ("Appointment Letter") that conferred upon him an appointment as a faculty member, effective July 1, 2001, at the rank of Assistant Professor "in the tenure system."

56. The Appointment Letter informed Plaintiff that he was on a "tenure-track position," and that his appointment was "subject to the rules and regulations" set forth in the Faculty Handbook.

57. Plaintiff's Appointment Letter promised Plaintiff that he would be "expected to carry out scholarly activities appropriate to a university," and to fulfill the full range of academic duties of faculty, consistent with the rights and responsibilities under the Faculty Handbook.

58. For more than 20 years, Plaintiff's work as a faculty member has been key to enabling the Department to perform its teaching, research, and services responsibilities.

59. Residents at CVM are trainees who work in a three-year training program towards becoming board certified pathologists.

60. When Plaintiff started at MSU, its residency program was exceedingly small.

61. Over the years, Plaintiff has been instrumental in growing the residency program and establishing it with an international reputation of excellence.

10.

62.     In 2007, Plaintiff became the Anatomic Pathology Section Chief of the Veterinary Diagnostic Laboratory ("VDL"), Anatomic Pathology.

63.     As a result of Plaintiff's hard work and high professional and ethical standards, the Anatomic Pathology section, and specifically the Veterinary Immunohistochemistry Laboratory within the VDL, is considered one of the premier veterinary diagnostic pathology laboratories in the world.

64.     Plaintiff has a stellar history of training the next generation of top pathologists and developing innovative molecular tests for the diagnosis and prognosis for canine and feline neoplasms.

**B.     Plaintiff is a Qualified Person with a Disability.**

65.     Plaintiff has been diagnosed with autism spectrum disorder ("ASD"), a diagnosis listed in the American Psychiatric Association's and Statistical Manual of Mental Disorders ("DSM").

66.     Plaintiff is a qualified person with a disability within the meaning of the Americans with Disabilities Act.

67.     ASD is a mental impairment that substantially limits Plaintiff's social communication and social interaction.

68.     ASD is a mental impairment that substantially limits Dr. Kiupel's social communication and social interaction across multiple contexts: (i) in social reciprocity; (2) in nonverbal communicative behaviors used for social interaction; and (3) in developing, maintaining, and understanding relationships.

69.     Dr. Kiupel's impairment makes it difficult for him to sustain back and forth (reciprocal) conversation. He tends to speak in a monologue without checking in with his communication partner and fails to notice visual and verbal cues.

70.     Dr. Kiupel's impairment makes it difficult for him to understand other people's facial expressions, or to appreciate personal space, and notice nonverbal cues from others.

71.     Dr. Kiupel's impairment causes him to exhibit body language that others find unusual.

72.     Dr. Kiupel's communication impairments make it difficult for him to adapt his behavior to match the social setting. He often speaks in a loud tone of voice which can be misinterpreted as yelling.

73.     Plaintiff's ASD causes him to have a high attention to detail and sustain intense concentration in areas of interest or expertise, and to have difficulty in attending to topics outside of his areas of interest or expertise.

74.     Plaintiff's communication impairments caused by his ASD manifest in taking things literally (literalness), difficulty understanding the subtext of conversations, inability to take part in reciprocal conversations, and a failure to interpret social cues.

75.     Plaintiff's ASD also manifests by his fixation on topics of discussion and a reduced understanding of others' reactions or emotions.

76.     Plaintiff's ASD causes him to have a lack of awareness of normal workplace rules, such as standing too closely to others, talking too loudly, and gesticulating while speaking, and mannerisms that others without Plaintiff's disability may find "odd" or "not normal."

77.     At all relevant times, Defendants knew of Plaintiff's disability and/or regarded him to have a disability.

78.     Plaintiff received negative evaluations from supervisors, who criticized him for being "enthusiastic and animated in [his] conversational tone," which he was advised was "generally not well received."

79.     Plaintiff had been criticized on the basis that his "eagerness to share opinion/insights often results in not listening to others," and "unproductive conversations."

80.     Dodd had described Plaintiff as "boorish," a term that is defined in the Merriam-Webster online dictionary to mean: "rudeness of manner due to insensitiveness to others' feelings and unwillingness to be agreeable."     This is a classic description of ASD. *See* https://www.merriam-webster.com/dictionary/boorish#:~:text=boorish%2C%20churlish%2C%20loutish%2C%20clownish,a%20drunk's%20boorish%20behavior.

II.     **MSU Faces Public Condemnation Relating to the Larry Nassar Sex-Abuse Scandal**

81.     On August 29, 2016, former gymnast Rachael Denhollander filed a criminal complaint against USA Gymnastics doctor, Dr. Larry Nassar ("Nassar") with MSU Police.

82.     Ms. Denhollander alleged that in 2000, at age 15, she was sexually abused by Nassar during treatments for lower back pain.

83.     At the time, Nassar was an associate professor in MSU's College of Osteopathic Medicine, who had for many years treated the University's gymnasts and served as the USA Gymnastics' team physician.

84.     On August 30, 2016, MSU announced that it was suspending Nassar from "clinical and patient duties." *See* Tim Evans, Mark Alesia, and Marisa Kwiatkowski, *"Former USA Gymnastics doctor accused of abuse,"* lNDYSTAR, Sept. 12, 2016, https://www.indystar.com/story/news/2016/09/l2/former-usa-gymnastics-doctor-accused-abuse/89995734/.

85.     On September 20, 2016, MSU announced that it had fired Nassar. *See* Mark Alesia, Marisa Kwiatkowski, and Tim Evans, *"Michigan State fires former USA Gymnastics doctor,"*

INDY.STAR., Sept. 20, 2016, https://www.indystar.com/story/news/2016/09/20/michigan-state-fires-former-usa-gymnastics-doctor/90735722/.

86.    It was contemporaneously reported that Nassar had been the subject of a sexual misconduct complaint at MSU as early as 2014, and that MSU had investigated the internal complaint but found no violation of MSU policy. *See id.*

87.    In the wake of the news, MSU faced widespread criticism based on its perceived failure to investigate and appropriately manage reports of sexual abuse by Nassar's female victims.

88.    In January 2018, Nassar was sentenced to an effective lifetime in prison for sexually assaulting his victims under a guise of medical treatment. *See* Scott Cacciola and Victor Mather, *:'Larry Nassar Sentencing: 'I Just Signed Your Death Warrant,* '" THE NEW YORK TIMES, Jan. 24, 2018, https://www.nytimes.com/2018/01/24/sports/larry-nassar-sentencing.html.

89.    During Nassar's week-long sentencing hearing in which scores of Nassar's victims recounted their abuse, MSU's long-serving president, Lou Anna K. Simon, was reportedly pressured to resign in connection to her management and/or response to allegations of Nassar's sexual abuse. *Id.*

90.    Simon and MSU faced criticism amid reports that female athletes had complained of sex-abuse by Nassar for decades, but that their complaints were ignored. *See, e.g.,* Kim Zozlowski, *"What MSU knew: 14 were warned of Nassar abuse,"* THE DETROIT NEWS, Jan. 18, 2018, https://www.detroitnews.com/story/tech/2018/0 l/18/msu-president-told-nassar-complaint-2014/1042071001/; *"Survivors slam MSU for response to complaints about Larry Nassar,"* CBS NEWS, Jan. 22, 2018, https://www.cbsnews.com/news/victims-slam-msu-for-response-to-complaints-about-larry-nassar/.

14.

91. Simon resigned as president on January 24, 2018, and was replaced by interim president John Engler, who resigned on January 17, 2019.

92. The following month, on February 22, 2018, the Office of Civil Rights ("OCR") within the United States Department of Education opened an investigation of MSU's Title IX compliance regarding the employment and conduct of Nassar, including MSU's handling of complaints or reports of sexual assault, which expanded into an investigation encompassing potential Title IX concerns against Dr. William Strampel, the former dean of MSU's College of Osteopathic Medicine who was one of Nasser's supervisors. *See* Ltr. from Meena Chandra, Regional Director, OCR, to Samuel **L.** Stanley, Jr., Pres., MSU, *OCR Docket No. 15-18-6901 Michigan State University,* 2 (Sept. 5, 2019), accessed May I, 2024, https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/l5186901-a.pdf.

93. In May 2018, MSU settled lawsuits with more than three hundred of Nasser's victims for $500 million. Jeremy Bauer-Wolf, *"Michigan State Settles Nassar Lawsuits for $500 Million,"* INSIDE HIGHER ED, May 16, 2018, https://www.insidehighered.com/news/2018/05/17/michigan-state-settles-nassar-survivors-half-billion-dollar-payout/

A. **2018: Birgit Puschner's Appoitmeut as Dean**

94. In June 2018, the MSU Board of Trustees recommended Birgit Puschner ("Dean Puschner") to serve as the new dean ofCVM, effective October 1, 2018.

95. During Dr. Puschner's tenure as dean, MSU continued to face criticism for its perceived failure to appropriately investigate and respond to the sexual assault ofNasser's young female victims.

96. In November 2018, MSU's former president, Simon, was criminally charged with lying to police about what she knew of the Nassar sex-abuse scandal before 2016. *See* Kim

Kozlowski, *"Ex-MSU President Simon charged with lying over Nassar,"* THE DETROIT NEWS, Nov. 20, 2018, https://www.detroitnews.com/story/news/local/michigan/2018/11/20/ex-msu-president-simon-charged-lying-over-nassar/2070287002/.

97.     In January 2019, John Engler, then MSU's interim president, was publicly condemned and pressured to resign after he reportedly suggested Nassar's victims were "enjoying" the "spotlight." *See, e.g.,* John David Jesse, *"Engler resigns as Michigan State University interim president,"* DETROIT FREE PRESS, Jan. 16, 2019, https://www.freep.com/story/news/education/2019/01/16/john-engler-resigns-msu-president/2594498002/.

98.     In September 2019, the United States Department of Education fined MSU an "historic $4.5 million" for "failing to report sexual violence, including abuse of hundreds of women" by Nassar. *"A Record Fine for Underreporting Sex Crimes,"* INSIDE HIGHER ED, Sept. 5, 2019, https://www.insidehighered.com/news/2019/09/06/education-depaitment-fines-michigan-state-45-million-not-reporting-nassar-crimes.

99.     At this time, MSU also entered into two agreements with the Department of Education, ending its probes into MSU's reported breaches of the Clery Act and Title IX, which provided for ongoing investigation and potential disciplinary measures, against MSU officials who failed to act against known sexual abuse on campus. *See id.*

### III.   December 2021:  Plaintiff is Sanctioned Following Erroneous Report to the OIE

#### A.    December 1, 2021: Plaintiff Discusses Oral Tactile Perception of Objects Versus Fingertip Tactile Perception During Biopsy Rounds with Residents

100.    On December I, 2021, during case review in the pathology laboratory, Plaintiff explained to residents, both male and female, that oral tactile perception of objects is much more sensitive and accurate then tactile perception with the fingertips.

IOI. This discussion was academic and came up in the context of the size of a tumor from a cat's mammary gland.

I 02. For 20 years, Plaintiff had used discussion and comparison of oral tactile perception with the tongue versus fingertip tactile perception in teaching in the context of discussing lesions or other masses.

I 03. In this instance, one of the residents mistakenly was presenting a small area composed of fibrous connective tissue as the surgically removed cancerous mass.

104. Plaintiff did not think the resident had the correct specimen on the slide due to its size, which he believed was too small to find with palpitation (as the cat's owner had done).

105. Kiupel asked if the cat's owner had found the tumor by licking it, which was meant to underscore that the specimen was incorrect in size since oral perception is much more sensitive than the palpation with fingers. Plaintiff has used this comment to teach the concept of linking clinical observation with microscopic appearance for years.

I06. Plaintiff did not intend a sexual meaning to his comments and was not aware of a sexual interpretation of his comments.

**B.  December 7, 2021:  OIE Report**

107. MSU designated the Office of Institution Equity ("OIE") to receive reports under MSU's Relationship Violence and Sexual Misconduct and Title IX Policy **(the "Policy").**

I08. Pursuant to the Policy, Defendant Schmidtke, in her role as Title IX Coordinator, designated OIE to implement the initial assessment and investigation of reports.

109. Under section XII of the Policy then in-effect, the formal grievance process is initiated only after a formal complaint is signed and filed by the claimant or the Title IX Coordinator. Under the Policy, the Title IX Coordinator may also refer the report to the respondent's unit and to Academic Human Resources or the Office of Employee Relations.

110.    On or about December 7, 2021, amid the continued public criticism of MSU in connection to the Nassar sex abuse scandal, OIE received a report that four female residents, (together, the "Claimants") within the Department *may* have experienced a violation of the Policy.

111.    The Claimants reported that they were not certain, but that they thought that Plaintiff *may* have intended sexual innuendo in his comments in the pathology laboratory, on December I, 2021.

112.    The claimants' text messages to each other (on December I, 2021) show that they were mocking Plaintiff and that each had been aware that Dr. Kiupel did not intend a sexual meaning to his statements.

113.    Plaintiff did not intend his comments in a sexual nature. None of his statements were objectively offensive or concerned concepts that were unrelated to the academic subject.

114.    The allegations were erroneous and, even if true, did not constitute "sexual harassment" under the Policy and should have been dismissed on that basis.

115.    Pursuant to Section XII.B-C of the Policy then in effect, the "OIE may gather information" in a "preliminary review" to determine coverage under this Policy and whether closure is appropriate.

### Closure

A report may move to closure if (I) a claimant cannot be identified; (2) specific circumstances prevent gathering information sufficient to reach a determination as to whether the reported conduct is covered under this Policy, *which may include a claimant's declining to file a formal complaint* or not responding to OIE's outreach; or (3) *the report is not covered under the criteria for a formal grievance process.*

116.    Under the Policy, the "coverage" criteria for a formal grievance includes that the conduct constitutes either (a) "RVSM" prohibited conduct or (b) Title IX "sexual harassment."

117.    Under the RVSM section of the Policy, which was effect on December 7, 2021,

"prohibited conduct" includes "sexual harassment." *(See* Section III of the Policy.)

118.    To constitute prohibited "sexual harassment" under the RVSM definition of the

Policy, the conduct must be both unwelcome and "directed at someone *because of that person's*

*sex."* "A person's subjective belief alone that behavior is offensive does not necessarily mean that

the conduct rises to the level of a policy violation. The behavior must also be objectively

offensive." *(See* Policy, section III.)

119.    Under section III of the Policy, the Title IX definition of prohibited "sexual

harassment" must meet one of three definitions:

> (I) Quid pro quo harassment ("an employee of the University conditioning a
> provision of aid, benefit, or service of the University on an individual's
> participating in unwelcome sexual conduct."
>
> (2) "Unwelcome conduct that is so severe, pervasive, and objectively offensive
> that it effectively denies a person equal access to the University's education,
> program, or activity as determined by a reasonable person standard."
>
> (3) "Other 'sexual offenses' as defined in the following statutes and described
> in this Policy: 'sexual assault' as defined in 20 U.S.C. 1092(f)(6)(A)(v),
> 'dating violence' as defined in 34 U.S.C. 1229l(a)(I0), 'domestic violence'
> as defined in 34 U.S.C. 1229l(a)(8), or 'stalking' as defined in 34 U.S.C.
> 12291(a)(30)."

120.    In this case, the allegations in the report submitted to OIE on or about December 7,

2021, plainly did not constitute either RVSM prohibited conduct or Title IX prohibited conduct, as

defined under the Policy, because *the allegations did not amount to objectively offensive conduct*

*that was sexual in nature.*

121.    Moreover, *all four of the Claimants declined to sign a formal complaint.*

122.    However, the report in this case did not move to closure.

123.     On information and belief, in situations where similarly accused females have been accused of allegations that, on their face, do not meet the criteria for a formal grievance under the Policy and/or the claimant(s) has declined to sign a formal complaint, the report has moved to closure.

124.     On information and belief, following the fall-out of the Nassar scandal, MSU was under extreme pressure-including from students, faculty, and staff-to believe all female victims and to punish all accused male perpetrators.

C.     December 17, 2021: Puchner, Agnew, Dodd, and Lewless Plan Adverse Actions **Against Plaintiff's Employment**

125.     Dr. Kimberly Dodd ("Dodd") is the Veterinary Diagnostic Laboratory ("VDL") director at the CVM.

126.     Plaintiff performs work for the VDL and reports to Dodd, in that capacity.

127.     Dr. Dalen Agnew ("Agnew") is Chair of the Department.

128.     Agnew is the person to whom Plaintiff directly reports, but Plaintiff's annual evaluations are done (or supposed to be done) with both Agnew and Dodd, and both are Plaintiff's supervisors.

129.     As early as December 17, 2021, Dean Puschner, Agnew, and Dodd planned to take adverse actions against Plaintiff's employment on the basis of the Claimants' erroneous December 7, 2021, report.

130.     On December 20, 2021, Dean Puschner sent an email to senior HR manager, Lewless, subject heading, "MK-next?," copying Dodd and Agnew, and in which she pressed Lewless for "next steps for Dr. Kiupel and timeline."

131.    Dean Puschner urged Lewless that, "we need to take appropriate action," and instructed Lewless that, if she did not provide "further guidance before December 23, 2022," she, Dodd, and Agnew would "send a message as discussed" to "MK, trainees, and the unit."

132.    That same day, Lewless emailed Puschner, Dodd, Agnew, and Director of the Office for Civil Rights and Title IX ("OCR"), Tom Fritz Jr., Senior Associate General Counsel, Theresa Kelley, and Vice Provost for Academic Resources, Suzanne Lang a document entitled *"Draft_Interim_Measures_Kupel.docx."*

133.    Lewless indicated that Schmidtke had already assigned an investigator.

134.    Lewless proposed that, although "[w]e will not have clarity between now and the end of the year as to the determination of the investigation," they should "proceed with interim measures as discussed in our meeting last Friday."

## D.    December 30, 2021:  Plaintiff is Subjected to So-Called "Interim Measures"

135.    On December 30, 2021, Agnew and Dodd met with Plaintiff via Zoom to inform him that "interim measures" were being imposed against him because of a "possible violation" of the "Policy" and a "potential investigation."

136.    Plaintiff was informed that he would not be allowed to go to work, that all of his teaching was canceled, and that his diagnostic work (which must be performed in the laboratory, e.g., necropsies) would be shifted to surgical biopsy service, which he would be required to perform at home.

137.    Plaintiff was provided no explanation or reason and no timeline for the so-called interim measures.

138.    Later that day, Agnew emailed Plaintiff a written letter, copying Puschner, Dodd, and Lewless, outlining so-called "interim measures," which included the following:

    (1) Plaintiff's work was "reassigned to solely focus on diagnostic duties which will occur remotely;"

    (2) Plaintiff's "work related to teaching in-person or virtually will cease until the conclusion to this case;"

    (3) Plaintiff was forbidden to "communicate directly with residents or graduate students," and advised that this restriction would be "reassessed at the conclusion of the case";

    (4) Plaintiff's access to the Veterinary Diagnostic Laboratory ("VOL") and CVM buildings were "restricted until further notice."

139.   Agnew wrote that the purported "interim measures" would be imposed during OIE's review and "potential  investigation" of the allegations.

140.   In his email, Agnew emphasized that the purported "interim actions" were *"not disciplinary, "* and asserted that they were being *"put in place to ensure the safety of our students and to protect [Plaintiff] as a faculty member during the review process."*

141.   Agnew advised Plaintiff that if he had questions, he should "feel free to contact" the OIE.

142.   On information and belief, MSU has never imposed upon a similarly situated female respondent accused of sexual misconduct comparably punitive and harsh "interim **measures.H**

143.   On information and belief, even in cases where a similarly situated female respondent has been accused of conduct which, if proved, would constitute *sexual harassment, stalking, and/or relationship violence* against a male complainant, MSU has not barred the female respondent's access to campus, reassigned her job duties, or forbidden her from communicating with residents or graduate students.

144.   On information and belief, no similarly situated female respondent has ever been subjected to comparable "interim measures" prior to an adjudication, and without apprising the female respondent of the allegations against her and the identity of the claimant(s).

145.   However, for more than five months, between January 5, 2022, and May 17, 2022, Plaintiff repeatedly requested information from OIE and an explanation of the sanctions against him, but to no avail.

146.   When Plaintiff contacted OIE for information, that office would refer him back to his academic unit (i.e., Dodd or Agnew).

147.   However, when Plaintiff went to Agnew or Dodd for information, they told Plaintiff that the "measures" were put in place by OIE and that they could do nothing about it and knew no details.

148.   In mid-March 2022, after countless ignored requests for information, Plaintiff was given the name of Ralph Johnson ("Johnson") as a Respondent "advisor."

149.   OIE also ignored Johnson's requests for information.

150.   On March 11, Johnson wrote to Schmidtke on Plaintiff's behalf, advising her that Plaintiff was "extremely frustrated, hurting, and in the dark regarding this matter." Johnson emphasized:

- There has been no notice of investigation given to him that outlines what has been alleged;
- He has been subjected to restricted access and altered working conditions for more than two months without an apparent reason;
- He reports that he has not received any updates for more than two months;
- He has reported to me that this situation is causing him excessive stress and anguish.

151.   Johnson again wrote Schmidtke on April 1, 2022, requesting a "prompt remedy," to which Schmidtke emailed the following on April 6, 2022:

To the extent that there are concerns about the interim employment actions that were put into place, I encourage Matti [Plaintiff] to connect with his unit and Faculty and Academic Staff Affairs [FASA] **....** The unit, in consultation with FASA, is responsible for decision making regarding interim employment measures in accordance with the Faculty Handbook and other HR-related policies.

152.     On April 6, 2022, Johnson responded to Schmidtke:

One of the most pressing concerns is that Matti [Plaintiff] has spoken with his unit, and his unit leaders have continued to express that the actions taken against him are driven by OIE.
Your message indicates that the Unit, FASA, are responsible for the employment actions that have been taken against him.

As you and I have discussed during our March 10th meeting, this has been extremely frustrating for Matti to have either department pointing at the other, while not hav[ing] any information regarding the accusation or specific rationale for these actions taken against him.

153.     On April 26, 2022, Johnson emailed MSU's General Counsel, subject, "Significant

Equity Concerns," with the following bullet-points:

- Employment actions taken against faculty member without a signed complaint or investigation against him. There is no clearly stated reason for the employment action, no process to seek understanding or expectation through and no resolution in sight because there is no existing complaint to resolve.

- Faculty members have suffered numerous hardships including, embarrassment, severed relationships, disruption of professional progress, mental and emotional anguish, grant disruption and much more.

- 4 months have passed and there is still no progress rnade on this matter. OIE informed us that he is not considered 'under investigation' at this time. OIE has indicated that the faculty member's unit is responsible for this decision.

- Faculty member keeps going to his unit and being directed back to OIE. His unit claims that they were advised toward these measures by OIE, which makes no sense and is not in line with MSU's process.

- The unit spoke with the faculty member today and are trying to change his appointment because *they are still waiting on OIE to finish the investigation… but he is not currently under investigation … so, he is being punished indefinitely, with no rationale or expected end.*

24.

(Emphasis added).

154. For *five months,* Plaintiff remained completely in the dark, subjected to sanctions, without a formal complaint or notice of investigation while OIE conducted a clandestine investigation.

155. On information and belief, Defendants had never previously imposed upon a similarly situated female employee purported interim measures that were comparably disciplinary, punitive, unduly burdensome, and career-damaging, or disregarded the emotional damage and harm of interim actions imposed on a female respondent.

### E.   The "Interim Measures" Imposed on December 30, 2021, Were Impermissible Under the Policy and Title IX

156. Section X. of the Policy then in effect provides that "supportive" measures are *"non-disciplinary, non-punitive individualized services, "* and lists examples such as referrals to counseling, modifications of work schedules, mutual no contact directives, "and other similar **measures."**

157. Under the Policy, interim measures are *"designed to restore or preserve equal access to MSU's education programs or activities,* "and *"will not unreasonably burden the other party."*

158. Likewise, under Title IX, "interim protective measure," must be "designed to protect the safety of all parties or the recipient's educational environment or deter sexual harassment." *See* 34 CFR § 106.30.

159. Under Title IX, "[a] recipient's response must treat complainants and respondents equitably ... by following a grievance process that complies with § 106.45 ***before*** the imposition of any disciplinary sanctions or other actions that are not supportive measures as defined in § 106.30, against a respondent." 34 C.F.R. § 106.44 (emphasis added).

160.    Under the Policy and under Title IX, the measures Defendants imposed were impermissibly punitive, served no legitimate protective purpose, and amounted to unwarranted discipline without a prior adjudication ("grievance process").

**F.    OIE Investigation Violates Plaintiff's Procedural Protections Under the Policy and Title IX**

161.    Under the Policy,"" the major stages of the formal grievance process are: 1) the investigation; 2) the hearing; 3) the decision; and 4) the appeal."

162.    Under the Policy, the formal grievance process is initiated only after a formal complaint is signed and filed by the claimant or the Title IX Coordinator. Section XII.D of the Policy provides that:

> **Formal Complaint:** The formal grievance process is initiated only when a formal complaint is signed and filed by the claimant or the Title IX Coordinator.
>
> **Content:** The formal complaint must set forth the specific allegations of prohibited conduct against the respondent(s), must be signed (in writing or electronically), and must request that the University investigate the allegation(s).
>
> **Anonymity:** A claimant cannot be anonymous once a formal complaint is signed.

163.    The Policy provides for equitable treatment and due process protections for both parties:

> 2.  Equitable Treatment:
> All procedures, rules, and practices adopted as part of the formal grievance process will apply equally to both parties. Parties will receive identical copies of all investigation reports and written decisions.
>
> 3.Presumption ofNon-Responsibility and Standard of Evidence:
> A respondent is presumed to be not responsible for the reported conduct until a determination regarding responsibility is made at the conclusion of the applicable formal grievance process. The presumption may be overcome only where a preponderance of the evidence supports a finding that the respondent is responsible for violating this Policy.
>
> 4.Standard of Proof:

The standard of proof is "preponderance of evidence." "Preponderance of the evidence standard" means that the respondent will be found responsible if, based upon all relevant evidence, it is "more likely true than not" that respondent is responsible for the reported conduct. If the evidence on a particular allegation is equally balanced, then that allegation is not "more likely true than not."

164.    The Policy requires that an investigation of a formal complaint be "a neutral fact gathering process" that is "fair and impartial and not rely upon stereotypes."

165.    The Policy requires that timely "notice of investigation" be given to "both the claimant(s) and the respondent(s), in writing" within three (3) business days of receipt of the formal complaint." The notice of investigation must "identify the parties; specify the date, time, location, and nature of the reported prohibited conduct; [and] identify potential policy violations."

166.    In addition, the Policy (section XIII of the version of the Policy then in effect) requires that the investigator appointed by the Title IX Coordinator "notify and seek to meet separately with the parties and third-party witnesses."

167.    The Policy further requires that "OIE will provide written notice of the date, time, location, participants, and purpose of all investigative interviews, or other meetings, with sufficient time for the party to prepare to participate in a meaningful way."

### G.    May 17, 2022: Schmidtke Signs Formal Complaint

168.    Five months *after* imposing discipline on Plaintiff, on May 17, 2022, Schmidtke, acting within her scope as Title IX Coordinator, signed a formal complaint and sent the parties notices of the complaint and investigation.

169.    None of the original four Claimants signed the complaint.

170.    The complaint alleged that the four Claimants were subjected to conduct by Plaintiff that *could* have violated MSU's applicable Policy based on five (5) alleged incidents spanning from the summer of 2019 through December of 2021.

171.   Schmidtke's Complaint indicated that the allegations would be examined under three versions of the Policy:

(I) RVSM Policy, effective February 8, 2019;
(2) RVSM Policy and Title IX Policy, effective August 14, 2020; and
(3) RVSM Policy and Title IX Policy August 24, 2021.[1]

172.   May 17, 2022, was the first time that Schmidtke or OIE notified Plaintiff of the Policy he was alleged to have violated and the first time that he was apprised of an investigation.

173.   On information and belief, Schmidtke had assigned the investigator and commenced a clandestine investigation, with no notice to Plaintiff, in December 2021.

174.   The descriptions of the allegations in Schmidtke's complaint were so vague and non-specific that the complaint failed to apprise Plaintiff of the allegations against him and deprived him of a meaningful opportunity to respond.

175.   For example, Schmidtke's complaint repeatedly fails to identify the individual Claimants by name or as individuals.

176.   The Complaint contains phrases like, "Claimants report," leaving Plaintiff in the dark as to the substance of what each of the individual "Claimants" reported.

177.   Schmidtke's complaint also fails to provide proper notice by apprising Plaintiff which provision or part of the Policy he allegedly violated with which of his alleged actions.

178.   The versions of the Policy that were in effect on August 14, 2020 and August 24, 2021 both included two sets of definitions: definitions for "RVSM" prohibited conduct (offenses

---

[1] MSU'S Policy has evolved over the years as the U.S. Department of Education has promulgated requirements in applicable regulations. The conduct alleged in the complaint invoked the "RVSM" Policy effective February 8, 2019, the "RVSM and Title IX" Policy effective August 14, 2020, and the "RVSM and Title IX Policy" effective August **24, 2021. The versions are generally referred to herein as the "Policy" unless otherwise identified by their effective** dates,

that did not rise to a Title IX violation) and definitions for "Title IX" "prohibited conduct" (which rose to a violation of Title IX).

179.   Schmidtke's Complaint failed to even link Plaintiff's allegedly "prohibited conduct" under any particular Policy provision or identify whether his alleged conduct was being evaluated under an RVSM or Title IX Policy definition.

180.   On information and belief, Schmidtke's complaint deviated from longstanding OIE practice in its failure to specify which Policy definition or provision applied to the allegations.

181.   When Plaintiff's advisor sought clarification from Schmidtke, she failed to provide any clarification.

182.   The conduct alleged on the face of Schmidtke's signed complaint, even if true, did not constitute violations of the Policy, as they described conduct that was not objectively offensive or sexual in nature.

H.   June 8, 2022:  Dean Puschner Announces Investigation to Entire Faculty

183.   On June 8, 2022, in violation of Plaintiff's right to confidentiality in the misconduct proceeding, Dean Puschner sent an email in which she announced to *the entire faculty* that there was a "CVM investigation underway."

184.   Plaintiff's co-workers could easily surmise that it was he who was under investigation given his forced absence from CVM for the past five months.

185.   Dean Puschner showed her lack of neutrality in Dr. Kiupel's proceeding when she sent an email to the entire faculty in the Department in which she urged members of the community to "come forward" with information and stressed the need to keep the *campus safe.*

186.   Dean Puschner's disclosure of the CVM investigation breached Plaintiff's right to privacy under the Policy and under Title IX, which required MSU to keep private the identity of

any claimant as well as any respondent in a Title IX proceeding, and damaged Plaintiff's reputation.

I.   **Investigation Focuses on Plaintiff's Social and Communication Difficulties**

187.   "Evidence" gathered in the investigation related to Plaintiff's impaired social communication and social interaction caused by his disability.

188.   In a statement to the investigator on April 20, 2022, Claimant K.S. referred to Plaintiff's *"uncomfortable mannerisms" and "strange sense of personal space,* " and stated that Plaintiff *"can be brash.* "

189.   Claimant A.G. told the investigator that Plaintiff was a *"close talker- to all people regardless of gender,* " and said he had *"weird mannerisms"* that no one else had, which were *"not normal and uncomfortable.* "

190.   Claimant R.G. indicated Plaintiff was *"very in your face and stands very close when he talks to you and … gesticulates a lot.* "  R.G. stated that other German people she knew did not have such mannerisms.

191.   Dodd described Plaintiff's behaviors as *"boorish"* and said that they created "an environment that is not conducive to positive exchange."

192.   Dodd stated that she "personally witnessed interactions where [Plaintiff] halts productive discourse."

193.   Dodd told the investigator that, on one occasion, Plaintiff "interjected with critiques and ways it could be improved upon. The Manager attempted to respond, and [Plaintiff] kept going with critiques to the point that Dodd needed to stop the discussion and ask that the group move on."

194. During an investigatory interview on October 6, 2022, Puschner reported that, on December 6, 2021, the Claimants reported to her and Dodd that they felt "uncomfortable" by the discussion during biopsy rounds.

195. Puschner's statements to the investigator contained no information to suggest that Plaintiff had ever engaged in any sort of sexual discourse, and certainly no sexual misconduct, with any of the Claimants.

196. Puschner told the investigator that she, Dodd, or Agnew had received reports from persons outside the University who indicated that Plaintiff sexually harassed them, but she did not offer any facts to substantiate her assertions, and neither Puschner nor Dodd nor Agnew identified any such purported individual by name.

197. Puschner's statements to the investigator were motivated by discriminatory animus, irrational fears, stereotypes, and/or raw malice toward Plaintiff's sex, gender, or disability.

198. At all relevant times, the Policy provided for *mandatory dismissal* of the formal complaint in certain circumstances.

199. In pertinent part, the Policy then in-effect provides:

> F. Dismissal Determinations
> Once a formal complaint is filed, it will proceed to an investigation under Section **XIII** *unless dismissed for the reasons set forth below.*

**1.    Title IX Formal Complaint Dismissal**

> a. *The formal complaint must be dismissed under Title IX if* the formal complaint does not meet all of the coverage requirements in Section XII.E.2 and/or *the allegations would not, even if proven, meet the definition of Title IX Sexual Harassment.*

**2.    University RVSM Formal Complaint Dismissal**

> a. *The formal complaint must be dismissed if* the complaint does not meet all of the coverage requirements in Section XII.E. l and/or *the allegations would not, even if proven, meet a definition of prohibited conduct.*

200.    In this case, the allegations would not, *even if proven,* meet any definition of prohibited conduct under the Policy.

201.    On information and belief, in cases where OIE has filed a formal complaint against similarly charged females respondents and the allegations would not, even if proven, meet a definition of prohibited conduct under tbe Policy, OIE has dismissed the formal complaint without proceeding to an investigation.

202.    MSU has also declined to take disciplinary action against similarly situated male faculty members who were contemporaneously knowu or reported to have engaged in serious sexual misconduct with female residents and staff.

203.    For example, one junior female faculty member, Jane Roe,2 who spoke on behalf of Plaintiff during the investigation, noted that she had previously reported to OIE that she had felt uncomfortable and targeted by Agnew's overtly sexual statements and conduct, including when Agnew used a stuffed animal toy in Dr. Roe's office to make a sexual gesture.

204.    Agnew, who is a reproductive pathologist, was also known to have made repeated sexual comments and innuendo to his students when teaching classes, as well as to persons in administrative roles, but he faced no consequences.

205.    Another similarly situated male faculty member of CVM, John Doe ("Dr. Doe"),3 ("Dr. Doe"),  was known to have made sexually inappropriate comments and "jokes."

206.    Students commented and complained in their evaluations of Dr. Doe that his sexual comments and "jokes" were inappropriate.

---

[2] **A use of a pseudonym is used to protect the identify of this junior faculty member who expressed fear of retaliation** of Agnew when she provided evidence on behalf of Plaintiff during his administrative proceeding.

[3] **A use of a pseudonym is used to protect the identity of this similarly situated faculty member, "Dr. Doe," who is not a named Defendant in this case.**

207. Dr. Doe was also known to have engaged in an inappropriate sexual relationship with a female resident at CVM.

208. It was also known that Dr. Doe had inappropriately requested that he be assigned to work with only one of female residents in the necropsy laboratory.

209. Dr. Doe and Agnew were both similarly situated to Plaintiff except that, unlike Plaintiff, neither of them had a disability.

210. Dr. Doe and Agnew, unlike Plaintiff, were both known to have engaged in sexually inappropriate conduct that, if proved true, would constitute actual violations of MSU's Policy, but MSU took no disciplinary action against Dr. Doe or Agnew.

### J. February 6, 2023: OIE's Final Investigation Report

211. Following fourteen months of punitive treatment imposed on December 30, 2021, OIE issued its final investigation report on February 6, 2023.

212. Despite Plaintiff's and his advisor's multiple requests for clarification during the investigation, in OIE's final investigative report, the investigator failed to identify which of the Claimants had made which statements.

213. In the final investigative report, the investigator attributed numerous statements to an unidentified "Claimant" or "Claimants," making it impossible for Plaintiff to know the identity of his accuser(s), to meaningfully respond, or to challenge the witness(es) credibility and knowledge.

214. The final report dismissed Plaintiff's concerns that the investigator had disregarded the witnesses he identified.

215. The investigator also dismissed Plaintiff's concerns that she interviewed individuals who possessed no information that was directly relevant to the allegations, solely for the purpose of providing prohibited character evidence against Plaintiff.

216. On information and belief, in other cases, OIE's investigator has not disregarded witnesses identified by similarly situated female respondents or sought out character evidence-which is prohibited under the Policy-for the purpose of bolstering a male complainant's case.

217. The final report also minimized Plaintiff's ongoing concerns that the OIE investigation and process was gendered, inequitable, and biased, and that he had not been afforded a presumption of innocence.

218. The final investigative report also sought to downplay Plaintiff's repeated complaints that MSU's process has been damaging to his career, due both to the related reputational harm and the effects of the so-called interim support measures imposed on December 30, 2021, which Plaintiff had contended were punitive.

219. On information and belief, MSU has not similarly disregarded a female respondent's concerns about gender bias, or a female respondent's complaint that interim measures were punitive, unduly burdensome, and/or damaging to her career.

220. During the investigation, at least one member of the faculty independently complained to OIE that witnesses were terrified that if they said something that was in any way supportive of Plaintiff, a male respondent, it would be seen as supportive of"sexual harassment" against females.

221. At least one faculty member complained that potential witnesses for Plaintiff were silenced by both the punitive actions MSU had already taken against Plaintiff, *before* an adjudication or finding of responsibility, and the biased comments of MSU Puschner and Agnew, which broadcast-prior to an adjudication-that they *believed* Plaintiff was responsible for alleged misconduct.

222.    OIE took no action to protect Plaintiff's rights to be treated equitably and presumed not responsible, or to ensure that his potential witnesses did not feel threatened or silenced.

223.    On information and belief, in other cases involving reports by third parties of alleged inequitable treatment, discrimination and/or retaliation against a female respondent in a Title IX process, OIE has acted on such reports.

K.    February 27, 2023: Dean Puschuer's Damaging Resignation Announcement

224.    On February 27, 2023, Dean Puschner officially announced her resignation from her role as Dean of the CVM.

225.    Dean Puschner's resignation letter noted, in part:

> When I joined the CVM, one of my priorities was to create a safe and supportive environment for work and study. We live in a time when people are increasingly comfortable reporting experiences of harassment, discrimination, or sexual assault, whether recent or in the past. As people seek justice for these wrongs, they rely on appropriate and professional case management as well as transparency and fairness of the investigative process so that they may find closure or the justice that is deserved. In my college, heroic current and former individuals were forthcoming despite the risk to their academic standing or career.

> Sadly, I am disheartened by MSU's approach to creating a supportive and respectful atmosphere for students, faculty, staff, and guests of all backgrounds. After years of all-consuming work, I came to the conclusion that I cannot, in good conscience, continue in my current role as Dean. ***The lack of success in holding individuals accountable for the hurt they have caused to others troubles me and crosses the boundaries of my professional ethics and personal integrity and morals.*** MSU needs rapid and sustained progress in this regard to minimize any future harm to individuals, and to retain talent.

*See* Krystal Nurse, *Veterinary school dean resigns over MSU S handling of sexual misconduct complaints,* March 3, 2023,
https://www.lansingstatejournal.com/story/news/local/2023/03/03/michigan-state-sexual-misconduct-complaints-birgit-puschner-dean-veterinary-school-resignation/69968264007/.

226.    The only publicly reported case of alleged sexual misconduct at CVM was Plaintiff's case.

227. Dean Puschner's biased comments were amplified in the press and undermined Plaintiff's right to be presumed not responsible.

228. On March 3, 2023, the Lansing State Journal reported that, "[t]he dean of [MSUs CVM] resigned this week, citing frustrations with how the university handles and responds to sexual harassment and assault." *See id*

229. As amplified in the press, Dean Puschner's comments falsely implied that Plaintiff's alleged had engaged in sexual harassment or sexual assault.

230. Plaintiff has never engaged in sexual harassment or sexual assault.

**L. One Day Before the Hearing, MSU Ordered Plaintiff to Vacate His Office and Reassigned Him to a Building Three Miles Outside the CVM**

231. On April 3, 2023, a day before the hearing on Plaintiff's **OIE** complaint commenced, Dodd sent Plaintiff a letter, advising him his office would be reassigned effective April I 0, 2023, and that he was to be reassigned from the VOL to the Food Safety and Toxicology Building, which was three miles away from the VOL.

232. Plaintiff had been barred from campus and had not set foot in his office since December 30, 2021, and Dodd noted that the "terms" of Agnew's December 30, 2021, letter "remain unchanged."

233. Dodd's letter advised Plaintiff that, if she did not hear from Plaintiff by April 5, 2023, she would "coordinate packing and transfer of [his] belongings."

234. Plaintiff complied with the order and relocated his things to the other building, but as of today, he remains barred from campus and unable to use *any* office at MSU.

**1. April 4-5, 2023: Hearing on the OIE Complaint**

235. Following a biased and flawed investigative process that did not adhere to MSU's applicable Title IX policy, a hearing was conducted on April 4-5, 2023.

236.    Consequently, Plaintiff engaged the undersigned counsel, Christine Brown, Esq., as his advisor and Plaintiff's advisor, Johnson, agreed to serve as his support person.

237.    A week prior to the hearing, MSU inexplicably pulled Johnson from Plaintiff's case and directed him that he could no longer serve as Plaintiff's support person.

238.    The hearing was presided over by a Resolution Hearing Officer, Erin Butcher, whom MSU hired as an external third-party.

239.    On April 10, 2023, The Detroit News reported that, on February 28, 2023, "[t]hen administrative leaders" from the CVM had written to Interim Provost Thomas Jeitschko in response to Dean Puschner's resignation to express "their concern and disappointment in the lack of support administrators gave to Puschner." *See* Kara Berg, "MSU Prof defies Years of Complaints," April 10, 2023, THE DETROIT NEWS.

240.    It was reported that Dean Puschner was not supported in implementing "appropriate discipline" against faculty who had been found to violate MSU polices, and that she has "become disheartened by MSU's approach to creating a supporting and respectful atmosphere, especially in handling harassment, discrimination, and sexual assault." *Id.*

241.    The local news article discussed Plaintiff by name and pointedly referenced his hearing the prior week, and what the article described as *his "suspension"* and *"an investigation that began in December o/2021 after several women reported him to the [OIE}." Id.*

242.    The Policy prohibits retaliating against a participant in a Title IX grievance process.

243.    At all relevant times, Section **IX** of the Policy provides that:

*The University will seek to protect the privacy of parties in compliance with applicable laws and regulations. The University will keep private the identity of any individual who has made a report or formal complaint of prohibited conduct under this Policy; the identity of any claimant; the identity of any respondent; and the identity of any witness.* The privacy of information exceptions include disclosures that may be permitted by the Family Educational Rights and Privacy

Act (FERPA) statute or regulations, are required by law, and/or are necessary to carry out the purposes of this Policy (including providing supportive measures, interim measures, any initial assessment, investigation, hearing, and/or appeal). Repmts, including the identities of the parties and the reported conduct, may be referred to other units for consideration under additional University policies.

244. On information and belief, MSU never investigated or filed any charge against any individual for breaching Plaintiff's right to privacy in his grievance process.

245. On information and belief, MSU has investigated or filed charges in cases of similarly situated female respondents whose right to privacy under the Policy has been breached.

### a. April 24, 2023: Hearing Officer Finds Plaintiff Not Responsible for Sexual Harassment, But MSU Maintains Sanctions Against Him

246. On April 24, 2023, Ms. Butcher rendered a decision in which she found that Plaintiff's actions did not constitute sexual harassment under Title IX.

247. Quoting the definition of "sexual harassment" under the Policy, Ms. Butcher explained that Plaintiff's *"conduct was not sexual in nature, individually or collectively, and was not objectively offensive."*

248. Accordingly, Ms. Butcher concluded that, "the record [did] not support by a preponderance of the evidence that [Plaintiff's] actions violated Title IX for sexnal harassment."

249. Ms. Butcher also found that Plaintiff's actions did not constitute "sexual harassment" under the Relationship Violence and Sexual Misconduct ("RVSM") policy.

250. Ms. Butcher opined that Dr. Kiupel's alleged conduct was not even sexual in nature, but concerned his *unintentional, innocuous, and gender-neutral comments and behavior.*

251.    Addressing the claimants' allegations concerning Plaintiff's *"mannerisms"* between summer 2019 and December 2021, Ms. Butcher's decision made the following factual findings concerning Plaintiff's mannerisms:

Kiupel's mannerisms

As addressed here, the record supports by a preponderance of the evidence that Kiupel is a closer talker, has a close sense of personal space, and leans in or stands in doorways with his arms up. The record is supported by a preponderance of the evidence that Kiupel sits with his legs splayed and his arms up and gesticulates when talking. The record supports by a preponderance of the evidence that these actions made [Claimant I], [Claimant 2], and [Claimant 3] uncomfortable and concerned them. The record supports by a preponderance of the evidence that Kiupel lacks self-awareness of the impact of these mannerisms and actions on others and was unaware that these actions were making Claimants uncomfortable or concerned them. Finally, the record does not support by a preponderance of the evidence that Kiupel acts differently with these mannerisms with Claimants or women than from anyone else.

252.    At the hearing, Plaintiff testified, without rebuttal, that others suggested to him that he may have ASD, and that his entire world is pathology.

253.    Despite the fact that MSU's hearing officer ultimately found that Plaintiff was not responsible for sexual misconduct and described his "mannerisms" in terms consistent with Plaintiff's disability, MSU has kept in place punitive sanctions against him and announced further sanctions, for no identified misconduct or policy violation.

254.    On information and belief, MSU has never in its history failed to lift purported interim measures from a similarly situated female respondent following a finding of *not responsible.*

255.    On information and belief, MSU has never in its history-imposed sanctions against a similarly situated female respondent accused of sexual misconduct following an adjudication in which the female respondent was determined *not responsible.*

256.     Back on December 30, 2021, Agnew indicated in his letter to Plaintiff that the purported "interim measures" were "not disciplinary," and stressed that they were only "put in place to ensure the safety of our students and to protect you as a faculty member." Agnew also indicated that the purported "interim measures" were temporary, "while the University reviews the **case."**

257.     Now that the case against Plaintiff has closed and he was found *not responsible for any misconduct,* the purported "interim measures" against him should be lifted, as there is no legitimate basis to maintain them.

> **b.** July 27, 2023: New Adverse Actions and Sham "Administrative **Review"**

258.     On July 27, 2023, Douglas Freeman ("Freeman"), MSU's Interim Dean, sent Plaintiff a letter, ("July 27 letter") on which he copied Jeitschko, the Interim Provost and Executive Vice President for Academic Affairs.

259.     The July 27 letter informed Plaintiff that the so-called "interim measures" which were imposed against him on December 30, 2021, *would remain in place.*

260.     The July 27 letter also announced the imposition of *new and additional sanctions* against Plaintiff' employment which included the following:

> (1) A prohibition against Plaintiff's "attendance (in person or by Zoom) at Pathology and Diagnostic Investigation (PDI) and VDL faculty and staff meetings due to the presence of students and trainees" and

> (2) A prohibition against Plaintiff from "representing the college or Michigan State University at any professional meetings, in order to restrict your interactions with students, trainees, and early career faculty."

261.     The July 27, 2023, letter also informed Plaintiff that CVM was *"initiating an administrative review of behavior by [Plaintiff]J that may violate University policies, including CVMs Guidance for Ethical Conduct."*

262.    No employment policy titled "CVM's Guidance for Ethical Conduct" is contained in the Faculty Handbook, and the Faculty Handbook provides for no such "administrative review" of Plaintiff's "behavior."

263.    The July 27, 2023, letter states:

Specifically, this review will assess whether (I) the factual determinations made by the Resolution Officer constitute a violation of University policies other than the RVSM and Title IX Policy; (2) you engaged in other reported behaviors that violate University policies; and (3) any found behaviors have impacted the CVM's ability to recruit, retain, educate and train students, residents, and faculty.

264.    Pursuant to the Policy, at the conclusion of the hearing, the Resolution Officer evaluated the evidence and made factual determinations, by a preponderance of the evidence, that Plaintiff was *not* responsible for sexual harassment under either the RVSM or Title IX Policy.

265.    The Claimants' allegations did not implicate any prohibited behavior.

266.    The so-called "administrative review" constitutes retaliation that is prohibited under the Policy.

267.    The Faculty Handbook does not authorize this purported "administrative review."[4]

268.    Under the Faculty Handbook, "[t]he administrative review procedure is an informal process providing . . . *an avenue for faculty . . . to request an independent assessment from their department chairperson/school director, dean, and Office of the Provost on such personnel matters as salary status, reappointment, promotion, and tenure."* (Emphasis added).

---

[4] In **a letter dated April 30, 2024, Dr. Freeman, notified Plaintiff of MSU's "intent to impose serious discipline" following the completion of its purported "administrative review," based on alleged policy violations,** *separate and apart* from the alleged violations of MSU's "Relationship Violence and Sexual Misconduct and Title IX Policy," for which Plaintiff had been found not responsible, on April 24, 2023. Dr. Freeman's April 30, 2024 communication **indicates that MSU's so-called "administrative review" was predicated on false, unresolved, and/or unsubstantiated** allegations, some nearly 20 years old, for which Plaintiff had no prior notice. While the outcome of MSU's **"administrative review" is not yet ripe for review, Plaintiff anticipates that, after he exhausts his administrative remedies, he will amend his Complaint with additional causes of action, including retaliation under applicable law.**

269. Given that Plaintiff has not been allowed to set foot into the VDL or CVM for more than two years, it is difficult to fathom what violation of *actual* University policies he could possibly be suspected of committing.

270. MSU is deviating from its own written policies and procedures by imposing unwarranted sanctions against Plaintiff's employment.

271. Like the earlier letter sent by Agnew on December 30, 2021, Freeman's July 27, 2023, letter asserts that the sanctions against Plaintiff *"are not disciplinary, " and that "[t[hese measures are put in place to ensure the safety of our students and trainees. "*

272. There is no need to protect students and trainees from Plaintiff.

273. The claim that MSU is conducting an "administrative review" and acting to protect students and trainees from Dr. Kiupel is a pretext for discrimination and/or retaliation against Plaintiff for participating in his Title IX process.

274. Indeed, the new prohibition imposed upon Dr. Kiupel-banning him from faculty meetings-is plainly a pretext for unlawful discrimination and/or retaliation because *students and trainees do not even attend faculty meetings.*

275. Title IX Regulations protect *any respondent who has participated* in an investigation or proceeding from retaliation. *See* 34 CFR § 106.71.

276. Under the Title IX Regulations, charging an individual with a code of conduct violation for the purpose of interfering with any right or privilege secured by Title IX constitutes retaliation. *Id.*

277. The Title IX 2020 Regulations provide, in pertinent part, that:

(a) Retaliation prohibited. No recipient or other person may intimidate, threaten, coerce, or discriminate against *any individual* for the purpose of interfering with any right or privilege secured by title IX ... , *or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate*

42.

*in any manner in an investigation, proceeding, or hearing* under this part. Intimidation, threats, coercion, or discrimination, including charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment, but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a report or formal complaint of sexual harassment, for the purpose of interfering with any right or privilege secured by title IX or this part, constitutes retaliation.

*Id.* (Emphasis added).

278.    Defendants' actions in imposing sanctions against Plaintiff for a non-existent violation of unspecified "University policies" constitute prohibited retaliation under Title IX.

### c.   Plaintiff's "Fundamental Rights and Responsibilities" as Tenured Faculty

279.    Section IV of the Faculty Handbook ("Handbook") is titled, "Academic Human Resources Policies," and sets forth the "rights and responsibilities" of faculty in the tenure system. *See* Handbook at 54, https://hr.msu.edu/_resources/pdf/faculty-handbook/fac_policy_man.pdf.

280.    This section of the Faculty Handbook acknowledges that faculty in the tenure system have certain "fundamental rights and responsibilities," which include *"academic freedom,"* participation in *"academic governance,"* rights and responsibilities associated with *"teaching,"* and rights and responsibilities associated with *"research and creative activity.* "

281.    The Faculty Handbook provides a "summary outline of the principal elements of academic freedom and responsibilities."

282.    Under the Faculty Handbook, the "principal elements of academic freedom" for faculty include, *inter alia:* "[t]he right, as teachers, to discuss in the classroom any material which has a significant relationship to the subject matter as defined in the approved course description," "[t]he right to conduct research and to engage in creative endeavors," "[t]he right to publish or present research findings and creative works," and "[t]he right to seek changes in institutional policy through established University procedures and by lawful and peaceful means."

283.    At all relevant times, Plaintiff satisfied all of the responsibilities associated with his

"fundamental rights" under the Faculty Handbook, except to the extent that Defendants' wrongful

actions have made the performance of his academic responsibilities impossible.

284.    Relative to academic governance, the Faculty Handbook provides, in part, that:

*The faculty have a right and responsibility to participate in the establishment and functioning of a governance system at the department or school, college, and University levels in accordance with Michigan State University Bylaws for Academic Governance to ensure academic freedom and the promotion of the goals of the institution.* The University looks to the faculty for recommendations on various academic personnel matters including faculty appointments, reappointments, promotions, the award of tenure, and salary increase guidelines; on the development of new academic programs and the modifications or discontinuance of existing programs, on academic curricula and standards; on definition of University mission and goals; on policies governing research and creative endeavors; on the formulation of annual budget requests and allocations; and on the selection and review of specified administrative officials, as well as other issues that concern the general welfare of the University, including student affairs and the academic environment.

(Emphasis added).

285.    The Faculty Handbook guarante.es to faculty a right and a responsibility to

"research and creative activity," and provides:

**Research and Creative Activity**

*To fulfill the University's mission of advancing and disseminating knowledge for* **the improvement of the welfare of the public, faculty members have a responsibility to conduct research and engage in creative activity in their area(s)** *of appointment and professional competence.* Recognition of professional competence and definition of area(s) of appointment occur in the basic academic units (departments, schools, non-departmentally organized colleges) through procedures in which established systems of peer review play a central role.

***As scholars, faculty members have the right and responsibility to create, seek,*** *and slate knowledge freely and openly and to strive for scholarly excellence.* The scholar has the right and responsibility to exercise critical self-discipline and judgment in generating, using, extending, and transmitting knowledge, to adhere to the highest standard of intellectual honesty, and to oversee and evaluate the research and creative efforts of students and subordinates. Faculty shall conduct all research and creative activity in a manner consistent with accepted scholarly standards and

in conformity with legal, professional, and University codes, policies, and regulations governing research and creative endeavors.

(Emphasis added).

286.    The Faculty Handbook acknowledges that membership in a "community of scholars" is also an essential aspect of the faculty member's right to academic freedom.

### d.    MSU's "Discipline and Dismissal of Tenured Faculty for Cause Policy"

287.    At all relevant times, MSU had in place a policy entitled the "Discipline and Dismissal of Tenured Faculty for Cause" ("Discipline Policy").

288.    Consistent with the standards of the American Association of University Professors ("AAUP"), MSU's procedures include considerable due process and opportunity for peer review before discipline is imposed.

289.    The Discipline Policy states that,

In all faculty discipline, the University bears the burden of proof that adequate cause exists; it will be satisfied only by clear and convincing evidence unless a different standard is required by law.

290.    The Discipline Policy provides procedures for discipline for tenured faculty in "two general categories": "minor discipline," (e.g., verbal and written reprimand, mandatory training, foregoing salary increase) and "serious discipline (e.g., "suspension with or without pay or permanent reduction in appointment").

291.    In the case of minor discipline, the Discipline Policy provides, in part, that:

the unit administrator shall first meet with the faculty member to discuss the administrator's concern and the potential for discipline. The administrator will notify the faculty member during that meeting of the right and opportunity to request a consultation with the department/school faculty advisory committee, its chair, or the chair of the UCFA personnel subcommittee before the administrator proceeds with any disciplinary action.

Should the unit administrator still wish to proceed with disciplinary action after that consultation, the administrator must consult with the dean and the Office of the Associate Provost to discuss the proposed disciplinary action. If the proposed discipline is authorized by those offices, the unit administrator shall provide the faculty member with written notice of the cause for disciplinary action in sufficient detail for the faculty member to address the specifics of the charges, and an opportunity to respond in writing prior to the imposition of any disciplinary action, within seven (7) days of receipt of the unit administrator's written notice. The dean must be copied on the written notice. The written response by the faculty member, if any, will be provided to the unit administrator, the dean, and the Office of the Associate Provost for further comment.

The unit administrator, in consultation with the dean, and *after considering the written response and further comments, if any, shall make a decision regarding the disciplinary action and notify the faculty member in writing. The discipline will then take effect.*

292.    In the case of serious discipline Tenured Faculty Discipline Policy provides, in part,

that:

the unit administrator or dean shall first meet with the faculty member to discuss the administrator's concern and the potential for discipline....

If that meeting does not resolve the issue, the unit administrator, in consultation with the dean, or dean shall consult with the Office of the Associate Provost to discuss the proposed disciplinary action. If the proposed discipline is authorized by the Office of the Associate Provost, the dean shall provide the faculty member with written notice of the proposed disciplinary action in sufficient detail for the faculty member to address the specifics of the charges.

The faculty member shall have seven (7) days after receiving the notice of proposed disciplinary action to (!) file a written statement with the dean regarding the proposed discipline, or (2) request a meeting with a disciplinary review panel of the UCFA. A request to meet with the review panel should be made to the dean, who will forward it promptly to the Chair of the UCFA. If the faculty member does not submit a written response or request a meeting with the disciplinary review panel within the seven-day period, the discipline will take effect.

293.    The preamble to the Discipline Policy provides that:

The University's commitment "to promote the welfare of mankind through teaching, research, and public service" is furthered by the intellectual integrity and professional honesty of faculty members mindful of their rights and responsibilities. Essential to sustaining an environment of mutual trust and respect is the need for impartial investigation of alleged violations of policies related to

faculty conduct; due process; and, when necessary, disciplinary action up to and including dismissal for cause. ***Discipline, dismissal, or the threat of either action, may not be used to restrain faculty members in their exercise of academic freedom.***

(Emphasis added).

### e.    Plaintiff Has Been Stripped   of His Fundamental   Rights and Responsibilities of his Tenured  Faculty Appointment

294.    The so-called interim measures that MSU imposed on December 30, 2021, which MSU extended and added to on July 27, 2023, have severely diminished Plaintiff's teaching and research responsibilities.

295.    To this day, Plaintiff is not permitted to do necropsy duty at CVM, (i.e., making a determination of the cause of death of an animal or a clinical diagnosis on the necropsy floor), and is limited to doing biopsy service without the assistance of residents.

296.    Denied access to the VDL and necropsy duty has substantially impaired Plaintiff's capacity to do research in animal pathology and disease because he is no longer allowed to examine animals in the laboratory.

297.    Since banning Plaintiff from working onsite at CVM, Agnew, and Dodd have substantially altered Plaintiff's job duties. Plaintiff has been completely stripped of *all* of his former duties involving clinical teaching of veterinary students and residents. Plaintiff can also no longer perform necropsies (autopsy of animals), as this work-which  had formerly been integral to Plaintiff's research and is an area of expertise-can only be performed onsite at the VOL.[5]  Plaintiff is also now forbidden to train residents in how to conduct biopsies.

298.    As a consequence of the unwarranted discipline imposed on Plaintiff, the vast majority of Plaintiff's work is now limited to "biopsy service," (mostly involving clients' live

---

[5] Such necropsy work that Plaintiff formerly performed is also key to recognizing infectious diseases that affect both animals and humans and to  protect the food source of the State of Michigan.

companion animals), which requires Plaintiff to spend his time picking up slides of biopsied tissues from the VDL, examining the slides at his home, and turning around a timely diagnosis for CVM's clients (mostly pet-owners). Defendants have thus limited Plaintiff to performing the type of work that one could expect to be performed by a clinician at a commercial laboratory, not an academician. Plaintiff, who at all relevant times excelled at teaching and research, has been effectively deprived of his ability to perform the essential academic requirements of his position, including teaching and research. In essence, since December 30, 2021, the vast majority of Plaintiff's work involves picking up slides from the VDL office and examining them at his home.

299.    This limitation on Plaintiff's work has severely diminished and/or prohibited outright Plaintiff's capacity to do his own research, to engage in creative activity, to publish papers that attract grant funding of his research, to mentor residents and graduate students who normally would assist him in his research, to accept collaborators to visit his lab, to accept even fully funded post-docs or visiting scientists to work with him, and to perform all of the other required elements of his chosen career path as an academic researcher.

300.    By forcing Plaintiff to work exclusively from home where he examines slides, prohibiting him from teaching and working with residents, and prohibiting Plaintiff from representing MSU at professional meetings, where he would normally share data with his academic peers, Defendants have effectively isolated Plaintiff from the academic community, both in and outside of MSU.

301.    As a consequence of Defendants' prohibition against Plaintiff's attendance at faculty meetings, Plaintiff is precluded from *voting, participating in, and making his voice heard at faculty meetings,* at which decisions effecting MSU's institutional policy are made.

302.     Faculty meetings are where faculty vote on matters relating to the revision of the curriculum, the structure of academic programs, departmental and college guidelines, composition, and type of committees, by-laws, and other matters key to institutional policy.

303.     Consequently, Plaintiff's right to participate in academic governance has been infringed without cause and without due process.

304.     The multiple deprivations of Plaintiff's academic freedom and fundamental rights and responsibilities as a faculty member are materially adverse actions with respect to Plaintiff's employment as a tenured faculty member at MSU.

305.     Defendants' adverse actions against Plaintiff's employment have also undermined his professional stature outside of MSU by making it impossible for him to carry out all of his academic functions, (including mentoring residents and students, conducting research, obtaining grants, collaborating with peers, and representing MSU at scholarly meetings), all of which are required in his chosen career path as an academic to maintain an elevated stature.

306.     Without a good professional reputation, Plaintiff cannot attract graduate students to work in his laboratory, cannot obtain funding for his research and cannot participate as a collaborator on publications and projects with other academics.

307.     The severe diminishment of Plaintiff's duties and the surrounding stigma of Defendants' investigations into the untrue allegations of sexual harassment have so severely damaged Plaintiff's professional reputation that it is unlikely if not impossible for him to continue in his chosen career path at another educational  institution, outside ofMSU.

### f.    Indicia of Damage to Plaintiff's Professional Reputation

#### i.    Disinvitation to contribute to the 7th edition of Jnbb, Kennedy, and Palmer's *Pathology of Domestic Animals*

308.    Plaintiff is a co-author of the 6th edition of Jubb, Kennedy, and Palmer's *Pathology of Domestic Animals,* widely regarded as the most comprehensive reference book published on the topic of pathology of the common domestic mammals.

309.    On or about June 9, 2022, Grant Maxie, DVM, PhD, Diplomate ACVP, University of Guelph, sent a group email, reaching out to Plaintiff's and other authors, requesting them to update their chapters for the 7th edition of *Pathology of Domestic Animals.*

310.    Plaintiff emailed Dr. Maxie that he was "happy to contribute," and "would like to expand some of the diseases that are currently partially in other chapters within the hematopoietic chapter, e.g. African swine fever, classical swine fever, PCV, strangles, glanders," and was "[l]ooking forward to working with [him] again."

311.    On June 18, 2022, Dr. Maxie emailed Plaintiff that he was inviting authors but would not be inviting Plaintiff to participate in this collaborative effort.

#### ii.    **Plaintiff** is **withdrawn as an author from the sixth edition of *The Tumors of Domestic Animals***

312.    Plaintiff was a contributing author of the *Tumors of Domestic Animals,* a comprehensive and authoritative reference on veterinary tumor pathology in common domestic animals.

313.    On February 13, 2023, Plaintiff received an email from the editor, Donald J. Meuten, DVM, PhD, Diplomate ACVP, Professor Emeritus at the College of Veterinary Medicine, North Carolina State University, requesting Plaintiff "withdraw as an author from the 6th edition of the *Tumors of Domestic Animals."*

314.    Dr. Meuten explained:

After feedback from several co-authors and much thought we respectfully request that you withdraw as an author from the 6th edition of the *Tumors of Domestic Animals.* Unfortunately, as a result of your sexual harassment charges, investigation, and official reports, we feel including you in this edition would be too great a risk of potential controversy and therefore too great a risk for the reputation of the book that Dr Moulton started in 1961. Please be aware this is a decision that we have thought about carefully, and we are aware of the loss that this will have to the expertise in the book. Please also be aware that we are basing this decision on the potential risk to the book, and we are not making a judgement on your personal situation.

We know you love pathology, and your contributions are extensive. Your references and how they have contributed to our understanding of several tumors will remain and you should be proud of those publications.

        **iii.**        **Plaintiff is withdrawn as editor and a lead author on the series of "Surgical Pathology of Tumors of Domestic Animals" which represents the WHO International Histological Classification of Tumors of Domestic Animals**

315.    On May 5th, 2023, Francisco Uzal, director of the Davis Thompson Foundation infonned Plaintiff that, the Board of Directors of the Davis-Thompson Foundation had received additional concerns from members of the Foundation, indicating that "based on recently published news articles" concerning Plaintiff's purported sexual misconduct, on April 24, 2023, the Foundation Board had decided to "immediately": **(1)** permanently remove Plaintiff from the "Faculty of Discussants" and (2) to remove Plaintiff from the "role of Editor and Writer for any fascicles on Surgical Pathology of Tumors of Domestic Animals."

## M.   Additional Indicia of Gender Bias

### 1.   The Office for Civil Rights Pressures Universities to Aggressively Pursue Sexual Misconduct Complaints

316.    On April 4, 2011, the United States Department of Education in the Office for Civil Rights ("OCR") issued a guidance document to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" ("2011 DCL").

*See* [RESCINDED] *Dear Colleague: From Assistant Secretary for Civil Rights,* Russlynn Ali, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

317.   The 2011 DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations and directed schools "to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects." 2011 DCL at 4.

318.   Despite its purported purpose as a mere guidance letter, the Department of Education treated the 2011 DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

319.   The 2011 DCL, while not completely ignoring due process concerns, suggested that schools should focus on victim advocacy and "minimize the burden on the complainant," *id.* at 15-16.

320.   Following the 2011 DCL, OCR put considerable pressure on universities to treat those accused of sexual misconduct-especially men-with a presumption of guilt. *See* Robin Wilson, *Presumed Guilty: College men accused of rape say the scales are tipped against them, CHRONICLE OF HIGHER EDUCATION,* (Sept. 1, 2014), https://www.chronicJe.com/article/presumed-guiltv/.

321.   On April 29, 2014, the OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* (the "2014 **Q&A"),** which was aimed at addressing campus sexual misconduct policies and advised schools to adopt a "trauma-informed" approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *See* Q&A at 31, https://www2.ed.gov/about/offices/Iist/ocr/docs/qa-201404-title-ix.pdf.

52.

322.    The 2014 Q&A continued OCR's quest to hamper respondents' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them. *Id.* at 25-31.

323.    Contemporaneous with the 2014 Q&A, the White House issued a report titled *Not Alone,* warning schools that, if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf. The report fu1ther advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could initiate investigations, compliance review, and/or litigation against schools suspected of violating Title IX.  *See id.*

324.    In June of 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the 2011 DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the DOJ. *See Testimony of Catherine E. Lhamon, Assistant Secretary Office for Civil Rights, U.S. Dep J of Educ.,* (June 26, 2014), https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-violence.pdt'.

### 2.    The OCR Rescinds the 2011 DCL and Adopts Enhanced Due Process Protections

325.    On September 22, 2017, the OCR formally rescinded the 2011 DCL and 2014 Q&A and put in place interim guidance (the "2017 Dear Colleague Letter" or "2017 DCL), while the OCR reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See Dep J of Educ., Dear Colleague Letter* (Sept. 22, 2017), *https:llwww2.ed.gov/about/officesllist/ocrlletters/colleague-title-ix-201709.pdf.*

326.     In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and which "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation." *See id.* (citations omitted).

327.     As former Secretary of Education Betsy DeVos noted, the rescission of the 2011 DCL was largely motivated by "[t]he truth . . . that the system established by the prior administration has failed too many students," specifically because "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims." Press Release, Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017), available at https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

### 3.     OCR Releases Final Regulations, Taking Effect August 14, 2020

328.     On May 6, 2020, the United States Department of Education released final Title IX regulations, (the "2020 Title IX Regulations"), which took effect on August 14, 2020. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance,* 85 Fed. Reg. 30,026 (May 19, 2020) (codified at 34 C.F.R. pt. 106).

329.     In a significant departure from the rescinded 2011 DCL and the 2014 Q&A, the 2020 Title IX Regulations make clear, *inter alia,* that schools can be found to discriminate on the basis of sex by treating either the complainant or the respondent unfairly andthat respondents must be presumed not responsible; that all relevant evidence must be evaluated objectively; that investigators and decisionmakers must receive non-biased training, may not rely on sex stereotypes, and must be impartial. *See* 34 C.F.R. § 106.45.

330.     MSU's ongoing discipline of Plaintiff --<lespite that he was found not responsible for any misconduct-is blatantly unfair and renders meaningless Plaintiff's right to be presumed not responsible under Title IX.

331.    MSU's ongoing discipline of Plaintiff is, thus, in violation of Plaintiff's rights under applicable law, including his right to be free of discrimination and/or retaliation by his employer for having participated as a respondent in his Title IX proceeding.

**N.    Plaintiff Has Suffered Immense Injury**

332.    As a direct and proximate result of Defendants' unlawful employment practices, Plaintiff has suffered damages, including tremendous financial costs, reputational harm, loss of existing contractual relations and prospective economic opportunities and advantage, mental anguish, physical pain and suffering, embarrassment, and severe emotional distress.

## COUNT I

### Violation of Title IX of the Education Amendments of 1972, U.S.C. § 1681 et seq.
### Selective Enforcement - Sex Discrimination
### (Against MSU Defendants)

333.    Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

334.    Title IX of the Education Amendments of the Education Amendments of 1972 ("Title IX") prohibits federal funded schools and universities from discrimination on the basis of sex. *See* 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.").

335.    The MSU Defendants receive federal financial assistance.

336.    Title IX may be violated by a school's imposition of discipline where gender is a motivating factor in its decision. *See Cannon v. Univ. of Chicago,* 441 U.S. 677 (1979). Title IX is enforceable through an implied private right of action. *See id.*

337.    Title IX prohibits any covered entity from discriminating in in employment "on the basis of sex." 34 C.F.R. § 106.51(a)(l).

338.    Title IX requires a school "to adopt and publish grievance procedures requiring the prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.S(b).

339.    "A selective enforcement claim under Title IX 'asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender.'" *Doe v. Columbia Coll. Chicago,* 299 F. Supp. 3d 939, 957 (N.D. Ill. 2017), aft'd, 933 F.3d 849 (7th Cir. 2019) (quoting *Yusuf v. Vasser College,* 35 F.3d 709, 715 (2d Cir. 1994)).

340.    In multiple instances, MSU Defendants selectively enforced Title IX against Plaintiff based on his sex by intentionally disregarding the requirements of its own Title IX Policy and procedures to Plaintiff's detriment, including, *inter alia,* by the following:

(1) On or about December 30, 2021, imposing discipline upon Plaintiff's employment without a formal complaint, without notice of an investigation, and without a finding that he was responsible for alleged misconduct. *See* supra ,¶,¶ 135-160.

(2) Allowing the investigator to abandon the neutral fact-finding process by instituting an investigation into Claimants' allegations without apprising Plaintiff of the investigation. *See* supra ,¶,¶ 129-135, 173.

(3) Disregarding Plaintiff's and his advisors' numerous requests for information concerning the allegations and the applicable policy. *See* supra ,¶,¶ 145-155.

(4) Conducting a clandestine investigation for five months without providing Plaintiff a notice of investigation. *See* supra ,¶,¶ 129-135, 150-155.

(5) Relying on the Resolution Officer's April 24, 2023, decision as a basis to open an unwarranted "administrative review" of Plaintiff's conduct, despite that she determined that Plaintiff was not responsible for alleged misconduct and her decision did not implicate any other type of prohibited conduct. *See* supra ,¶,¶ 246,258, 261-265.

(6) Declining to lift the so-called "interim measures" after Plaintiff was found not responsible for any misconduct on April 24, 2023, and imposing new and additional "interim measures upon his employment on July 27, 2023. *See supra* 'lf'lf 258-260.

(7) Denying Plaintiff his rights to equitable treatment and to a presumption ofnon-responsibility by simply accepting the Claimants' subjective impressions over Plaintiff's word in the application of its Policy. *See* supra **'lf'lf** 100-106, 110-111, 113, 163.

(8) Signing a formal complaint and opening up a formal grievance process against Plaintiff based on allegations which, on their face, did not constitute a violation of the Policy. *See* supra 'lf'lf 119-120, 246-250.

341. Through the numerous actions taken by the MSU Defendants against Plaintiff, which favored the four female Claimants and relied simply on their word over Plaintiff's in the application of its Policy, MSU Defendants have demonstrated that, but for Plaintiff's sex (male), they would not have reasonably disregarded their own Policy to Plaintiff's detriment.

342. As a direct and proximate result of Defendants' conduct, Plaintiff suffered significant, irreparable harm and damages, including, without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## COUNT II

## Violation of Title IX of the Education Amendments of 1972, U.S.C. § 1681 et seq.
### Erroneous Outcome
### (Against MSU Defendants)

343. Plaintiff repeats and realleges each and every allegation hereinafter above as iffully set forth herein.

344. In the context of school disciplinary proceedings, a plaintiff may also demonstrate discrimination on the basis of sex on a theory of "erroneous outcome." *See Doe v. Miami Univ.,* 882 F.3d 579, 592 (6th Cir. 2018) ("To plead an erroneous-outcome claim, a plaintiff must allege:

(I) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding and (2) a particularized ... causal connection between the flawed outcome and gender bias." (internal citations and quotation marks omitted).

345.    As alleged in the foregoing paragraphs, Plaintiff has plausibly alleged sex discrimination under an erroneous outcome theory, because despite that the hearing officer found that Plaintiff was *not* responsible for sexual misconduct, MSU refused to lift Plaintiff's punitive sanctions MSU's administrators erroneously failed to lift Plaintiff's punitive suspension and ban from campus and imposed *further sanctions* against him. *See supra* **¶,¶,¶** 258-260.

346.    As alleged in the foregoing paragraphs, the extreme pressure on MSU to address allegations of female victims of sexual harassment combined with the procedural irregularities, casts doubt on the legitimacy of the outcome, and supports a plausible inference of a causal connection between the ongoing discipline MSU has imposed against Plaintiff and gender bias. *See supra* **¶,¶,¶**81-93, 95-99, 117-120, 129-168, 172••182, 186, 198-200, 124, 211-215, 220-222, 237, 246-250, 258-265, 316-326.

347.    As a direct and proximate result of Defendants' conduct, Plaintiff suffered significant, irreparable harm and damages, including, without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## COUNT Ⅲ

### Violation of Title IX of the Education Amendments of 1972, U.S.C. § 1681 *et seq.*
### Sex Discrimination in Employment - Disparate Treatment
### (Against MSU Defendants)

348.    Plaintiff repeats and realleges each and every allegation hereinafter above as iffully set forth herein.

349. Title IX prohibits ... discrimination by a school system in the benefits, terms, and conditions of employment on the basis of employees' sex." *Haley v. Clarksville-Montgomery Cnty. Sch. Sys.,* 353 F. Supp. 3d 724, 731 (M.D. Tenn. 2018); *see Mesbah v. Univ. of Louisville,* No. 3:22-CV-567-CHB, 2023 WL 6050232, at *16 (W.D. Ky. Sept. 15, 2023) (noting that Sixth Circuit holds "that Title IX creates a private cause of action for employment discrimination" and expressly ruled that Title VII does not preempt an individual's remedy under Title IX) (citing *Ivan v. Kent State University,* 92 F.3d 1185, 1996 WL 422496 (6th Cir. July 26, 1996)) and *Arceneaux v. Vanderbilt University,* 25 F. App'x 345, 346-47 (6th Cir. 2001)); *see also* C.F.R. § 106.31(b) (prohibiting schools from "subject[ing] any person to separate or different rules of behavior, sanctions, or other treatment" on the basis of sex).

350. The Sixth Circuit has explained that "[b]ecause Title IX does not provide an analytical framework for claims of gender discrimination by an educational institution, most circuits, including ours, have applied the *McDonnell Douglas* burden-shifting framework used in analyzing discrimination claims arising under Title VII." *Arceneaux v. Vanderbilt Univ.,* 25 F. App'x 345, 347 (6th Cir. 2001).

351. In the context of a university sexual misconduct proceeding, a university employee demonstrates a *prima facie* case of sex discrimination under Title IX by establishing that the university: "(I) takes an adverse action against a[n] ... employee, (2) in response to allegations of sexual misconduct, (3) following a clearly irregular investigative or adjudicative process, (4) amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex." *Menaker v. Hofstra Univ.,* 935 F.3d 20, 33 (2d Cir. 2019); *see also Vengalattore v. Cornell Univ.,* 36 F.4[th] 87, 106 (2d Cir. 2022).

352.     Plaintiff has plausibly alleged circumstances providing the requisite support for a *prima facie* case of sex discrimination under Title IX.

353.     As alleged in the foregoing paragraphs, MSU: (I) took adverse actions against Plaintiff when, on December 30, 2021, it suspended and barred Plaintiff from campus; (2) took these adverse actions in response to allegations of purported sexual misconduct; (3) deviated from its written policies governing its investigation process-and Title IX requirements-by failing to apprise Plaintiff of the allegations against him, alleged policy violations, or even the identities of the four Claimants and, instead, kept Plaintiff in the dark/or *a full five months* while it instituted a clandestine investigation into allegations, which, on their face, would not have constituted a violation ofMSU's Title IX Policy, *even if proved;* and (4) all the while, was under intense criticism and historic sanctions for its failure to appropriately respond to allegations of female victims of sexual assault and harassment, motivated by pro-female, anti-male bias, to refute the widespread criticism of MSU for failing to appropriately respond to the allegations of female students and athletes of sexual assault and harassment. *See supra* ¶¶ 81-93, 95-99, 100-106, 119-120, 129-160, 246-250, 316-326.

354.     Under the alleged circumstances, a discriminatory intent against Plaintiff on the basis of sex is plausible. *See, e.g., Doe v. Columbia Univ.,* 831 F.3d 46, 58 n. II (2d Cir. 2016).

355.     The Second Circuit has explained:

> A defendant is not excused from liability for discrimination because the discriminatory motivation does not result from a discriminatory heart, but rather from a desire to avoid practical disadvantages that might result from unbiased action. A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that patticular sex.

*Id.*

356.    As a direct and proximate result of Defendants' conduct, Plaintiff suffered significant, irreparable harm and damages, including, without limitation, emotional and psychological distress, loss of career oppmiunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## COUNT IV

### Violation of Title IX of the Education Amendments of 1972, U.S.C. § 1681 et seq.
**Retaliation**
**(Against MSU Defendants)**

357.    Plaintiff repeats and realleges each and every allegation herein above as iffully set forth herein.

358.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

359.    Defendant MSU is an "educational program" under Title IX.

360.    Defendant MSU receives federal funding.

361.    Retaliation by an educational program receiving federal funds against a person for engaging in protected activity under Title IX is actionable.

362.    To state a claim for retaliation, a plaintiff must allege: "that (I) [s]he engaged in protected activity, (2) [the funding recipient] knew of the protected activity, (3) [s]he suffered an adverse school-related action, and (4) a causal connection exists between the protected activity and the adverse action." *Bose v. Bea,* 947 F.3d 983, 988 (6th Cir. 2020).

363.    Participation by "any individual" in any manner in a Title IX investigation or proceeding constitutes protected activity under Title IX. *See* 34 C.F.R. § 106.71. Prohibited

retaliation against any such individual includes charging him with a code of conduct violation for the purpose of interfering with any right or privilege secured by Title IX. *See id.*

364. As alleged in the foregoing paragraphs, Plaintiff engaged in Title IX protected activity when he responded to allegations that he engaged in sexual misconduct as the named respondent in a Title IX complaint. *See supra* **l)'l)** 235-238.

365. As alleged in the foregoing paragraphs, after being found not responsible in MSU's Title IX process in a decision rendered on April 24, 2023, MSU maintained all of the so-called "interim measures" against Plaintiff, despite that there was no legitimate need for them. *See supra* 'll'll 246, 258-260.

366. On July 27, 2023, after the hearing officer found Plaintiff not responsible in MSU's Title IX process, MSU opened an erroneous "administrative review" which was not authorized by MSU's applicable employment policies. *See supra* if'!) 258, 261-272.

367. On July 27, 2023, the MSU Defendants also imposed two new sanctions against Plaintiff's employment: (1) prohibiting Plaintiff from participating in academic governance and (2) prohibiting Plaintiff from representing MSU in professional meetings and forums based on a non-existent policy violation. *See supra* **,r** 260.

368. As a result of Defendants' retaliatory actions, Plaintiff's rights and responsibilities connected to his faculty appointment have been significantly altered and diminished, which has significantly and negatively impacted his professional stature and reputation, and his capacity to continue in his profession. *See supra* **,r,r** 279-286, 294-315.

369. MSU's actions were taken for the purpose of interfering with Plaintiff's right to participate in a Title IX proceeding. *See supra* **,ri[** 262-278.

370.    The close temporal proximity between the hearing (April 4-5, 2023) and the Resolution Officer's decision (rendered on April 24, 2023) in Plaintiff's Title IX proceeding, which was rendered in Plaintiff's favor, and the subsequent adverse actions taken against him by MSU on July 27, 2023 demonstrates a causal connection between his protected activity in participating in the Title IX process and the adverse action. *See supra* ¶¶246-247, 258, 260.

371.    That a retaliatory motive played a part in the adverse actions taken against Plaintiff is obvious where MSU cited a non-existent policy and claimed to be conducting an "administrative review" of a "potential" violation pursuant to a non-existent procedure. *See supra* ¶¶261-262, 267-268.

372.    As alleged in the foregoing paragraphs, MSU's retaliatory motivation against Plaintiff is also demonstrated by the purported "interim measures" which MSU has maintained against Plaintiff since December 30, 2021, for no legitimate protective purpose. *See supra* ¶¶ 259, 271.

373.    As a result of Defendants' retaliation, Plaintiff has suffered reputational harm, mental pain, and anguish, including without limitations, physical pain and suffering requiring medical treatment, including development of fatty liver and weight gain, sleep apnea and symptoms of anxiety and depression. Chronic stress has been shown as the main cause of metabolic dysfunction-associated fatty liver disease (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9921904/) that reduces the life expectancy by about 4.4 years for men Q1ttps://www.medicinenet.com/how_long_do_you_live_with_nafld/article.htm).

374.    As a result of the foregoing, Plaintiff is entitled to a judgment against Defendants awarding Plaintiff damages in an amount to be determined at trial, including without limitation,

damages to physical well-being, emotional and psychological damages, damages to reputation, plus attorneys' fees, and an order lifting the so-called interim measures which were imposed on December 30, 2021 and on July 27, 2023, and an order enjoining Defendants from imposing upon Plaintiff any bar to working on campus, including the VOL and the necropsy floor, and any bar against teaching, mentoring, or advising students.

## COUNTY

### Violation of the Fourteenth Amendment of the U.S. Constitution, 42 U.S.C. § 1983
**Procedural Due Process**
**(As to Defendants Puschner, Lewless, Agnew, Dodd, Schmidtke, Freeman and Jeitschko in their individual capacities for monetary damages and in their official capacities for injunctive and declaratory relief)**

375.    Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

376.    The Fourteenth Amendment guarantees procedural due process. U.S. Const. Amend.XIV.

377.    To make a procedural due process claim, a plaintiff must a "establish three elements; (I) that he had a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment, (2) that he was deprived of this protected interest within the meaning of the Due Process Clause, and (3) that the state did not afford him adequate procedural rights prior to depriving him of his protected interest." *Gunasekera v. Irwin,* 551 F.3d 461,467 (6th Cir. 2009) (internal citations and quotation marks omitted).

*A. Plaintiff was deprived of protected property and liberty interests.*

378.    At all times relevant, Plaintiff had a clearly established property interest in the terms and conditions of his employment as a tenured professor under the 14th Amendment of the U.S.

64.

Constitution. *See Smock v. Bd. of Regents of Univ. of Mich.,* 2018 WL 6046202 (E.D. Mich. Nov. 19, 2018).

379.    "In the context of university employment, the Supreme Court has held that rules and understandings, promulgated and fostered by state officials can form the foundation of a protected property interest." *See Gunasekera,* 551 F.3d at 467 (citing *Perry v. Sindermann,* 408 U.S. 593, 602-03 (1972)).

380.    Plaintiff is a tenured professor, and under the terms of his employment, he had an express guarantee that he would not be subject to discipline except for cause. *See ¶¶* 1, 54-56, 287-292.

381.    Plaintiff had a clearly established property interest in both his tenured appointment and his fundamental rights and responsibilities of his appointment, including his teaching, researching, and creative activities, all of which are necessary for him to maintain his professional stature and to continue in his chosen profession. *See ¶¶* 1, 54-56, 279-292 *Gunasekera,* 551 F.3d at 467; *Smock,* 2019 WL 2231231, at *2.

382.    The longstanding and explicit mutual understanding between MSU and the faculty that all of these teaching, research, and creative responsibilities are "fundamental" to a faculty appointment is evidenced in the terms of Plaintiff's employment, as set forth in Plaintiff's 2001 appointment letter and the Faculty Handbook. *See ¶¶* 279-286.

383.    The deprivation of Plaintiff's right to teach, to do research, and to engage in creative activity implicates Plaintiff's liberty interests in his professional stature and his ability to continue in his chosen career path. *See ¶¶* 294-300, 304-307.

384.    The deprivation of Plaintiff's rights and responsibilities associated with his tenured appointment have left him unable to secure funding for his own research, unable to attract graduate

students to work in his laboratory, unable to attend scientific meetings, substantially diminished his ability to publish papers and unable to perform all of the academic obligations necessary to maintaining his professional reputation and continuing in his chosen profession, either at MSU or another institution. *See* ¶,¶,¶ 299-300, 304-307.

385.    Defendants also deprived Plaintiff of his protected liberty interest in participation in academic governance, which has further damaged Plaintiff's professional stature and reputation by further isolating him from his colleagues at MSU, particularly under the circumstances, i.e., the wake of his sexual misconduct process. *See* ¶,¶,¶ 260, 301-303.

386.    "The Due Process Clause of the Fourteenth Amendment protects an individual's liberty interest in their reputation, good name, honor, and integrity." *Crosby v. Univ. of Kentucky,* 863 F.3d 545,555 (6th Cir. 2017) (citations and internal quotation marks omitted).

387.    "That liberty interest is impugned when a state actor stigmatizes an individual by means of "voluntary, public dissemination of false information" about the individual." *Id.* (internal quotation marks omitted).

388.    That liberty interest is impugned when a state actor stigmatizes an individual's reputation such that it will interfere with his ability to secure new employment or continue in his profession. *See Cannon v. Village of Bald Head Island, North Carolina,* 891 F.3d 489 (4th Cir. 2018).

389.    Defendants' significant changes to and diminishment of Plaintiff's rights and responsibilities, in conjunction with the stigma surrounding Defendants' investigations into the *untrue* allegations of sexual misconduct, *see* ¶,¶,¶ 100-106, 110-114, 120-122, so severely damaged Plaintiff's professional reputation that it is difficult if not impossible for him to continue in his profession, either at MSU or another institution. *See* ¶,¶,¶ 305-307, 308-315.

B. *Plaintiff has been deprived of his protected property and liberty interests without due process required by MSU S written policies and normal practice.*

390. Under MSU's Relationship Violence and Sexual Misconduct and Title IX Policy ("the Policy"), a faculty member accused of a Policy violation was entitled to be served a formal complaint and a notice of investigation prior to the imposition of discipline. *See* 11 161-162.

391. Under the Policy and MSU's normal practice, the formal complaint must apprise the respondent of the specific allegations and the identities of the claimant(s); anonymous allegations are not permitted. *See* **11** 161-162, 165.

392. Under the Policy and MSU's normal practice, a respondent is entitled to a presumption of innocence and "equitable treatment." See 11150, 152-153, 155,163.

393. Under the Policy and MSU's normal practice, OIE opens a formal complaint that apprises a respondent of the allegations and the identities of his accuser(s) *before* proceeding with an investigation into alleged misconduct. *See* 11150, 161-162, 165.

394. Under the Policy and MSU's normal practice, during the investigation of sexual misconduct allegations, a respondent is entitled to be updated and apprised of the status of the investigation. *See* 11150, 166-167.

395. Under MSU's Policy and Discipline Policy and MSU's normal practice, *before* the imposition of any discipline, a tenured member of the faculty must receive notice and a hearing on the charges, and there must be a finding that he is responsible by a preponderance of the evidence. *See,,* 159, 161.

396. As alleged in the foregoing paragraphs, contrary to MSU's written policies and practice, Defendants violated Plaintiff's due process rights when, *inter alia:*

(I) On December 30, 2021, Defendants imposed severe adverse actions against Plaintiff's employment without notice of the alleged Policy violation, without affording him an opportunity to respond, without a hearing, and without a

finding by a preponderance of the evidence that he was responsible for any policy violation. *See ¶,¶,¶* 135-160.

(2) Defendants commenced a clandestine investigation into the allegations against Plaintiff without a formal complaint or a notice of investigation. *See ¶,¶,1* 129-135, 173.

(3) After sanctioning Plaintiff's Defendants on December 30, 2021, Defendants kept Plaintiff completely in the dark of the allegations against him for five months before issuing him a formal complaint and notice of investigation on May 17,2022.See'1['1[ 129-135, 150-155, 168,172.

(4) Defendants deprived Plaintiff notice of the charges against him and an adequate opportunity to respond when they issued him a formal complaint on May 17, 2022 that asserted non-specific factual allegations, did not clearly state which provisions of the Policy he was alleged to have violated, and which lumped together the allegations of four "Claimants," so that Plaintiff had no way to know the identity of his accuser. *See ¶,¶,¶* 170, 174-1781.

(5) On February 6, 2023, Defendants continued to deprive Plaintiff notice and an adequate opportunity to respond to the charges when they issued him a final investigation report that consolidated allegations by four "Claimants" so that Plaintiff could not know the identity of his accuser. *See '1['1[* 211-213.

(6) On July 27, 2023, following an April 24, 2023 decision by a Resolution Officer that Plaintiff was not responsible for any violation, Defendants announced that they were keeping purported "interim measures" in place and imposed new and additional disciplinary measures upon Plaintiff's employment without notice of the charges, without opportunity to respond, and without a hearing. *See ¶,¶,¶* 258-260.

397.    At all relevant times, Defendants, in their individual and official capacities, were executing official MSU policy and acting under color of state law.

398.    Accordingly, Defendants are liable to Plaintiff pursuant to 42 U.S.C. § 1983 for their deprivation of Plaintiff's constitutional rights and damaging him as alleged herein.

399.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered significant, irreparable harm and damages, including, without limitation, emotional and

psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## COUNT VI

### Violation of Section 504 of the Rehabilitation Act
**Disability Discrimination**
**(As to MSU Defendants, for equitable relief and compensatory damages)**

400.    Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

401.    Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ...  shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a); *see Clemons as next friend of T.W. v. Shelby Cnty. Bd. of Educ.,* 818 F.App'x 453,463 (6th Cir. 2020).

402.    The basic purpose of§ 504 "is to ensure that handicapped individuals are not denied jobs or other benefits because of the prejudiced attitudes or the ignorance of others." *Sch. Bd. of Nassau Cnty, Fla. v. Arline,* 480 U.S. 273, 287 (I 987).

403.    "Congress acknowledged that society's accwnulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." *Id*

404.    At all relevant times, Plaintiff had a disability, *see supra* ¶65-80 and was qualified to perform the essential functions of his position as a tenured faculty member, with or without accommodation, within the meaning of the Rehabilitation Act. *See* ¶¶ 40-54, 58-64.

405.    Plaintiff suffered multiple adverse employment actions in that he was subjected to unwarranted "interim measures" that were impermissible under MSU's employment policies

69.

solely because of his disability. Consequently, he had his duties dramatically changed, was banned from campus, teaching, and working in the laboratory. *See ,r,r* 187-195, 202-210, 250-253, 256-260.

406.  As alleged in the foregoing, Dean Puschner spoke with the four Claimants on December 6, 2021.

407.  All of the conduct described by the four Claimants related to behavior that was directly attributable to Plaintiff's disability. *See supra ,r,r* 188-190, 251.

408.  None of the Claimants alleged objectively sexual conduct by Plaintiff.  *See ,r,r* 100-106, 112, 195, 250-251.

409.  Even so, and even before the OIE investigation commenced, MSU's Human Resources, Dean Puschner, and Plaintiff's supervisors, Dodd, and Agnew, planned to take adverse action against Plaintiff's employment. *See supra,r,r* 125-134.

410.  Deviating from its written employment policies, MSU took adverse action against Plaintiff's employment on December 30, 2021, for a purported violation of the Policy before conducting an investigation, and without issuing Plaintiff a formal complaint. *See supra ,r,r* 135-137-140, 150, 156-157, 160.

411.  Plaintiff's supervisors justified the adverse actions as necessary to protect the safety of the campus community, despite that Plaintiff had taught on campus for 20 years and had never been disciplined or charged with threatening anyone's safety at CVM.

412.  The Claimants' allegations against Plaintiff, even if proved true, would not have constituted a violation of the Policy.

413.  During the investigation and at the hearing, the conduct described by the Claimants was consistent with the social and communicative difficulties caused by Plaintiff's disability,

which was the sole basis for the employer's adverse actions against him. *See supra* '1['1[ 67, 71-76, 187-190, 251,253.

414.    Even after a decision in which the Resolution Officer found that Plaintiff was not responsible, Defendants failed to lift the purported "interim measures" imposed upon Plaintiff on December 30, 2021, and added additional "measures," which are de facto discipline. *See* **,r,r** 253, 258-260.

415.    On July 27, 2023, Defendants imposed additional discipline upon Plaintiff, which it purported to justify by an "administrative review" into his "behavior" that is not justified by any MSUpolicy.

416.    As alleged in the foregoing paragraphs, MSU did not subject similarly situated male faculty members to discipline who were known or reported to have engaged in serious sexual misconduct with female residents and staff.  *See* '1['1[ 202-210.

417.    MSU has "excluded [Plaintiff! from participation in, ...  denied [him] the benefits of, or ...  subjected [him] to discrimination under the program solely by reason of [his] handicap." *See Tuck v. HCA Health Services of Tennessee, Inc.,* 7 F.3d 465, 473 (1993).

418.    As a direct and proximate result of the MSU Defendants' conduct, Plaintiff has suffered, and will continue to suffer, significant, irreparable harm and damages, including, without limitation, emotional and psychological distress, embarrassment and humiliation, physical pain and suffering requiring medical treatment, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## COUNT VII

### Violation of Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seIJ;*
### Disability Discrimination
### (As to Dean Puschner, Agnew, Dodd, Freeman, and Jeitschko, in their official capacities for prospective injunctive and declaratory relief)

419. Plaintiff repeats and realleges each and every allegation hereinafter above as if fully set forth herein.

420. "Title I of the ADA prescribes standards applicable to the States. Those standards can be enforced . . . by private individuals in actions for injunctive relief." *Bd. of Trustees of Univ. of Alabama v. Garrett,* 531 U.S. 356,374 (2001); *see, e.g., Whitfieldv. Tennessee,* 639 F.3d 253, 257 (6th Cir. 2011) ("An *Ex parte Young* action may be commenced only against a state official acting in her official capacity and may seek only prospective relief to end a continuing violation of federal law.") (quotation marks and citations omitted).

421. Section 12112(a) of the Americans with Disabilities Act ("ADA") states a general prohibition of discrimination against a qualified individual on the basis of disability in regard to the terms, conditions, and privileges of employment."

422. In addition, ADA section 12112(b)(l) prohibits "limiting, segregating, or classifying a[n] ... employee in a way that adversely affects the opportunities or status of such .. employee because of the disability of such ... employee."

423. A person is "disabled" under the ADA if "she (1) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (2) has a record of such impairment, or (3) is regarded by her employer as having such an impairment." *Talley v. Fam. Dollar Stores of Ohio, Inc.,* 542 F.3d 1099, 1105 (6th Cir. 2008) (internal citations and quotation marks omitted).

72.

424. "The ADA's regarded-as-disabled provision is designed to stamp out the stereotyping of and discrimination against persons with disabilities in all their forms." *Id.*

425. At all relevant times, Plaintiff was a disabled person within the meaning of the ADA, *see* **,r,r**if'l[ 65-80, was qualified to perform the essential functions of his job with or without reasonable accommodation, *see* **,r,r** 40-54, 58-64, and suffered an adverse employment decision because of his disability.

426. As alleged in the foregoing paragraphs, Plaintiff has alleged discrimination under the ADA on the basis of an actual and/or perceived disability. *See Cobb v. Jones Apparel Grp., Inc.,* 23 F. App'x 480,481 (6th Cir. 2001).

427. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered, and will continue to suffer, significant, irreparable harm and damages, including, without limitation, emotional and psychological distress, embarrassment and humiliation, physical pain and suffering requiring medical treatment, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

### **.rouNTVIII**

**Violation of the Equal Protection Clause of the Fourteenth Amendment**
**Discrimination Based on Sex**
(As **to Defendants Puschner, Lewless, Agnew, Dodd, Schmidtke, Freeman and Jeitschko in their individual capacities for monetary damages and in their official capacities for injunctive and declaratory relief)**

428. Plaintiff repeats and realleges each and every allegation as set forth hereinabove as if fully set forth herein.

429. The Equal Protection Clause of the Fourteenth Amendment guarantees all persons in the United States "the equal protection of the laws."

430.    "Individuals have a right, protected by the Equal Protection clause of the Fourteenth Amendment, to be free from discrimination based on sex in public employment." *Finkv. Genesee, Cnty. of,* No. 22-10107, 2023 WL 3571915, at \*4 (E.D. Mich. May 19, 2023) (citing *Davis v. Passman,* 442 U.S. 228, 234-35 (1979)).

431.    "Both Title VII and section 1983 provide relief for discriminatory employment practices of public employers." *Gutzwiller v. Fenik,* 860 F.2d 1317, 1325 (6th Cir. 1988).

432.    As alleged in the foregoing paragraphs, Plaintiff (1) was a member of a protected class (male); (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) he was treated differently than similarly situated, non-protected employees. *See ,¶,¶* 142-144,   155,216,219-221,201,223,245,254-255.

433.    Accordingly, Plaintiff alleges a violation of his rights under the Equal Protection Clause. *See Briggs v. Univ. of Cincinnati,* **11** F.4th 498,508 (6th Cir. 2021).

434.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered, and will continue to suffer, significant, irreparable harm and damages, including, without limitation, emotional and psychological distress, embarrassment and humiliation, physical pain and suffering requiring medical treatment, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

<u>**COUNT IX**</u>

<u>**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.***</u>
**(As to the MSU Defendants)**

435.    Plaintiff repeats and realleges each and every allegation as set forth hereinabove as if fully set forth herein.

436.    Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* prohibits an employer from discriminating against an employee on the basis of their sex.

437.    By the conduct alleged in detail above and herein, Defendants, through their agents and/or employees, subjected Plaintiff to disparate treatment and disparate discipline on the basis of his gender.

438.    To establish a claim for disparate treatment on the basis of gender, a plaintiff must demonstrate that: "(l) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) ... similarly situated non-protected employees were treated more favorably." *Jackson v. VHS Detroit Receiving Hosp., Inc.,* 814 F.3d 769, 776 (6th Cir. 2016).

439.    Plaintiff is a male and is therefore a member of a protected class.

440.    As described in the foregoing paragraphs, Plaintiff has suffered adverse employment actions, including being banned from campus and scholarly activities since December 30, 2021, ongoing discipline after he was found not responsible for any misconduct, in April 24, 2023, and subjected to increased sanctions imposed by MSU on July 27, 2023. *See supra* **n** 246, 258-260.

441.    Plaintiff was a qualified employee. During his 20-plus year career as a professor at MSU, Plaintiff performed the duties required by his position in a satisfactory manner. Plaintiff is a world-class pathologist, has received recognition for his contributions to his field, has published more than 370 peer-reviewed scientific manuscripts and numerous book chapters and books in the field of veterinary and comparative pathology, has mentored numerous residents and students, and was instrumental in growing and establishing the residency program at CVM at MSU as an internationally recognized leader in veterinary education.

442.    As described in the foregoing paragraphs, similarly situated female professors were treated differently than Plaintiff. *See* **,r,r** 142-144, 155, 216, 219-221, 20I, 223, 245, 254-255.

443. Further, as described above at **,r,r** 256-257, 260--274, Defendants' purported justification for these sanctions was a pretext for unlawful discrimination, as evidenced by Defendants' deviations from MSU's policies and procedures.

444. As described in the foregoing paragraphs, Defendants, by their individual and or concerted acts and/or omissions, including but not limited to those described herein, engaged in unlawful employment discrimination on the basis of Plaintiffs sex or gender, in violation of the Civil Right Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000 to 2000e-17.

445. As a direct and proximate result of the foregoing, Plaintiff did suffer and continues to suffer substantial damages, including without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational harm, and other direct and consequential damages.

### COUNT X

#### Violation of Substantive Due Process Fourteenth Amendment
**Materially Adverse Employment Actions Based on Invidious Discrimination in Violation of Equal Protection Clause**
**(As to Defendants Puschner, Lewless, Agnew, Dodd, Schmidtke, Freeman and Jeitschko in their individual capacities for monetary damages and in their official capacities for injunctive and declaratory relief)**

446. Plaintiff repeats and realleges each and every allegation as set forth hereinabove as if fully set forth herein.

447. "Interests protected by substantive due process ... include those protected by specific constitutional guarantees, such as the Equal Protection Clause." *Bell v. Ohio State Univ.,* 351 F.3d 240, 249-250 (6th Cir.2003).

448. As alleged in the foregoing paragraphs, Defendants took materially adverse employment actions against Plaintiff's employment, which have stripped him of his rights and responsibilities to teach, to mentor, to conduct research, to share data and information with his

peers, to secure grant funding, to produce and publish papers, to be a member of the academic community, to participate in academic governance, and to perform all of his other academic obligations which are necessary to maintain his professional stature and to continue in his chosen profession, to which he has dedicated his life. *See* ii 294-315.

449. As alleged in the foregoing paragraphs, the actions taken against Plaintiff's employment are materially adverse because of the employer's conduct, *see* ii 135-138, 232, 258-260, and are not "a mere inconvenience or an alteration of job responsibilities" or "de minimis." *Mitchell v. Vanderbilt Univ.,* 389 F.3d 177, 182 (6th Cir. 2004).

450. Plaintiff had a fundamental right not to be deprived of these rights and responsibilities based on invidious discrimination against his sex, in violation of the Equal Protection Clause. *See Hopkins v. Canton City Bd. of Educ.,* 477 F. App'x 349,365 (6th Cir. 2012); *Gutzwiller* v. Fenik, 860 F.2d 1317, 1328-29 (6th Cir.1988).

451. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered significant, irreparable harm and damages, including, without limitation, emotional and psychological distress, loss of career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff Matti Kiupel prays for the following relief:

(i) On the first count of violation of Title IX of the Education Amendments of 1972, (sex discrimination-selective enforcement), a judgment against Defendants the Board of Trustees of Michigan State University and Michigan State University:

a. damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and

performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, and

b.  injunction against Defendants enjoining enforcement of the sanctions imposed upon Dr. Kiupel, expunging Plaintiff's disciplinary records, requiring Defendants to destroy all documents and records concerning the Claimants' allegations and related investigations from Dr. Kiupel 's personnel file; and reinstatement of Dr. Kiupel's rights and responsibilities as a tenured faculty member and a declaration that Plaintiff did not commit sexual harassment and did not violate MSU's Policy;

(ii) On the second count of violation of Title IX of the Education Amendments of 1972, (sex discrimination-erroneous outcome), a judgment against Defendants the Board of Trustees of Michigan State University and Michigan State University:

a.  damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, and

b.  injunction against Defendants enjoining enforcement of the sanctions imposed upon Dr. Kiupel, expunging Plaintiff's disciplinary records, requiring Defendants to destroy all documents and records concerning the Claimants' allegations and related investigations from Dr. Kiupel's personnel file; and reinstatement of Dr. Kiupel's rights and responsibilities as a tenured faculty member and a declaration that Plaintiff did not commit sexual harassment and did not violate MSU's Policy;

(iii) On the third count of violation of Title IX of the Education Amendments of 1972, (sex discrimination in employment), a judgment against Defendants the Board of Trustees of Michigan State University and Michigan State University:

a.  damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, and

b.  injunction against Defendants enjoining enforcement of the sanctions imposed upon Dr. Kiupel, expunging Plaintiff's disciplinary records, requiring Defendants to destroy all documents and records concerning the Claimants' allegations and related investigations from Dr. Kiupel's personnel file; and reinstatement of Dr. Kiupel's rights and responsibilities

as a tenured faculty member and a declaration that Plaintiff did not commit sexual harassment and did not violate MSU's Policy;

(iv)    On the fourth count of violation of Title IX of the Education Amendments of 1972, (retaliation), a judgment against Defendants the Board of Trustees of Michigan State University and Michigan State University:

    a.   damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, and

    b.   injunction against Defendants enjoining enforcement of the sanctions imposed upon Dr. Kiupel, expunging Plaintiff's disciplinary records, requiring Defendants to destroy all documents and records concerning the Claimants' allegations and related investigations from Dr. Kiupel's personnel file; and reinstatement of Dr. Kiupel's rights and responsibilities as a tenured faculty member and a declaration that Plaintiff did not commit sexual harassment and did not violate MSU's Policy;

(v)   on the fifth count of violation of the Fourteenth Amendment of the U.S. Constitution, pursuant to 42 U.S.C. § 1983, based on procedural due process, a judgment against Defendants Dean Puschner, Lewless, Agnew, Dodd, Schmidtke, Freeman and Jeitschko, in their individual capacities for monetary damages and in their official capacities for injunctive and declaratory relief:

    a.   a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to Plaintiff's physical well-being, emotional and psychological damages, past and future economic losses, loss of career opportunities, punitive damages, together with prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

    b.   an injunction against Defendants enjoining enforcement of the sanctions imposed upon Dr. Kiupel and a declaration that Plaintiff did not commit sexual harassment and did not violate MSU's Policy;

(vi)    On the sixth count of violation of Section 504 of the Rehabilitation Act, a judgment against Defendants the Board of Trustees of Michigan State University and Michigan State University:

    a.   Compensatory damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career

prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, and

b. injunction against Defendants enjoining enforcement of the sanctions imposed upon Dr. Kiupel, expunging Plaintiff's disciplinary records, requiring Defendants to destroy all documents and records concerning the Claimants' allegations and related investigations from Dr. Kiupel's personnel file; and reinstatement of Dr. Kiupel's rights and responsibilities as a tenured faculty member and a declaration that Plaintiff did not commit sexual harassment and did not violate MSU's Policy;

(vii) On the seventh count of violation of Title I of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.,* a judgment against Dean Puschner, Agnew, Dodd, Freeman, and Jeitschko, in their official capacities for prospective injunctive and declaratory relief:

a. An injunction against Defendants enJommg enforcement of the sanctions imposed upon Dr. Kiupel and a declaration that Plaintiff did not commit sexual harassment and did not violate MSU's Policy.

(viii) On the eighth count of violation of the Equal Protection Clause of the Fourteenth Amendment for discrimination based on sex, a judgment against Dean Puschner, Agnew, Dodd, Freeman, and Jeitschko in their individual capacities for monetary damages and in their official capacities for injunctive and declaratory relief:

a. a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to Plaintiff's physical well-being, emotional and psychological damages, past and future economic losses, loss of career opportunities, punitive damages, together with prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

b. an injunction against Defendants enjoining enforcement of the sanctions imposed upon Dr. Kiupel and a declaration that Plaintiff did not commit sexual harassment and did not violate MSU's Policy;

(ix) on the ninth count of violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*

a. Compensatory damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of career and performance opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, and

      b.   injunction against Defendants enJommg enforcement of the sanctions imposed upon Dr. Kiupel, expunging Plaintiff's disciplinary records, requiring Defendants to destroy all documents and records concerning the Claimants' allegations and related investigations from Dr. Kiupel's personnel file; and reinstatement of Dr. Kiupel's rights and responsibilities as a tenured faculty member and a declaration that Plaintiff did not commit sexual harassment and did not violate MSU's Policy;

(x)    on the tenth count of violation of the Fourteenth Amendment of the U.S. Constitution, pursuant to 42 U.S.C. § 1983, based on substantive due process, a judgment against Defendants Dean Puschner, Lewless, Agnew, Dodd, Schmidtke, Freeman and Jeitschko, in their individual capacities for monetary damages and in their official capacities for injunctive and declaratory relief:

      a.   a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to Plaintiff's physical well-being, emotional and psychological damages, past and future economic losses, loss of career opportunities, punitive damages, together with prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

      b.   an iajunction against Defendants enjoining enforcement of the sanctions imposed upon Dr. Kiupel and a declaration that Plaintiff did not commit sexual harassment and did not violate MSU's Policy.

## **JURYDEMAND**

Dr. Matti Kiupel herein demands a trial by jury of all triable issues in the present matter.

**[SIGNATURES ON FOLLOWING PAGE)**

Dated:  June 27, 2024
         New York, New York

Respectfnlly snbmitted,

NESENOFF & MILTENBERG, LLP
*Attorneys for Plaintiff Matti Kiupel*

By: *Isl Andrew Miltenberg*
Andrew T. Miltenberg, Esq.
*(pro hac vice* forthcoming)

Stnart Bernstein, Esq.
*(pro hac vice* forthcoming)

Christine  Brown,  Esq.
*(pro hac vice* forthcoming)

363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
cbrown@nmllplaw.com

By: *Isl   Julie Sacks*
Julie A. Sacks, Esq.
*(pro hac vice* forthcoming)

101 Federal Street, 19th Floor
Boston, Massachusetts 02110
(617) 209-2188
jsacks@nmllplaw.com

BOGAS & KONCIUS P.C.
*L  c!iitCounsel for Plaintiff Dr. Matti Kiupel*

By:
Brian E. Koncius, Esq. (P69278)
31700 Tel        ad, Suite 160
Bingham Farms, MI 48025
248-502-5000 (telephone)
248-502-5001 (fax)
bkoncins@kbogaslaw.com